JAMES ARTHUR CALHOUN *v.* STATE OF MARYLAND

[No. 129, September Term, 1981 and
No. 5, September Term, 1982.]

*Decided November 21, 1983.*

*Motion for reconsideration filed November 30, 1983; denied December 5, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Gary W. Christopher* and *George E. Burns, Jr., Assistant Public Defenders,* with whom were *Alan H. Murrell, Public Defender, Arthur A. DeLano, Jr., Assistant Public Defender, Courtland K. Townsend, Jr., Assigned Public Defender,* and *James Cromwell, Assigned Public Defender,* on the brief, for appellant.

*Richard B. Rosenblatt, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Deborah K. Handel, Assistant Attorney General,* on the brief, for appellee.

Supplemental argument on January 6, 1983. *George E. Burns, Jr., Assistant Public Defender,* for appellant and *Deborah K. Handel, Assistant Attorney General,* for appellee.

SMITH, J., delivered the opinion of the Court. DAVIDSON, J., dissents and filed a dissenting opinion at page 646 *infra.*

In this case we shall affirm a death sentence. In the process we once again are involved with the matter of hypnotically enhanced testimony, this being the fifth of a series of cases presenting that issue. *See State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983); *State v. Metscher,* 297 Md. 368, 464 A.2d 1052 (1983); *Simkus v. State,* 296 Md. 718, 464 A.2d 1055 (1983), and *Grimes v. State,* 297 Md. 1, 464 A.2d 1065 (1983).

James Arthur Calhoun was convicted by a Montgomery County jury of first degree, premeditated murder in the death of Philip Metz (principal in the first degree), murder in the first degree (felony murder) in the death of David Myers (principal in the second degree), attempted murder of Douglas Cummins, two violations of the handgun law, robbery with a deadly weapon, and storehouse breaking. A jury sentenced him to death for the murder of Metz. Life imprisonment was imposed for the murder of Myers. He was sentenced to thirty years for the attempted murder of Cummins. The sentence for each of the handgun violations was imprisonment for fifteen years. He was sentenced to twenty years on the robbery charge and to ten years on the count for storehouse breaking. All sentences imposed are to run consecutive to each other except for the sentence for storehouse breaking which is concurrent. The case reaches us by virtue of the provisions of Maryland Code (1957, 1982 Repl. Vol.) Art. 27, § 414 which states that whenever the death penalty is imposed we shall review the case.

i The facts

The facts are not in dispute. Pursuant to Maryland Rule 828 g the parties have entered into an agreed statement of facts. We shall repeat only so much of the grisly details of

this incident as are necessary for a clear understanding of the case and our decision.

The W. Bell store is located at 1130 New Hampshire Avenue in White Oak, Montgomery County. Banging noises coming from the area of the Bell store were heard by a neighbor across the street at approximately 11:00 p.m. on March 26, 1981. She saw shadows in the area of the roof at the back of the store. The neighbor notified her father, who went outside their home with a flashlight to investigate. He saw people leaving. She saw a car, which looked like a hatchback, parked across the street.

An employee of Electro Protective Corporation testified that at 6:16 a.m. on March 27, 1981, both the safe alarm and the perimeter alarm at the Bell store were activated. He notified the police; Douglas T. Cummins, Jr., Bell's assistant manager; and David W. Myers, an employee of Electro. Officer Philip Carl Metz, the police officer covering that beat on that particular day, was dispatched to the Bell store.

Cummins testified that at approximately 6:20 or 6:25 a.m. on March 27 he received a telephone call from Electro. He arrived at the store at about 7:00 a.m. at which time he saw a white station wagon with Electro's name on the door in front of the store. He observed a late model two-door black Cadillac on the other side of the parking lot. A black male in the front seat was the sole occupant.

The technician in the Electro vehicle identified himself to Cummins. Cummins drove around the store and noticed that the outside of the building appeared to be secure. Officer Metz arrived on the scene at about 7:15 a.m. Cummins unlocked Bell's door with a set of master keys. He, Officer Metz, and Myers entered the building. They first checked the merchandise area. Then they proceeded to the cashroom. It had two doors, both of which supposedly could be opened only from the inside. Cummins put a key into the door. Upon his opening the door Officer Metz stepped in front of him to enter. At that moment Cummins noticed "a shoulder and about half of a back of an individual standing to the right of the doorway." Metz was pulled into the doorway as another, shorter individual armed with a pistol jumped into the hallway area. Cummins did not see the place from which the

shorter man came. Myers drew his gun and stumbled back into a hallway door when he was shot. Cummins said he realized he had been shot in the upper shoulder area of his chest. After thirty to forty-five seconds the taller man opened the door and dragged Cummins into the office. Cummins at that point observed Metz lying on the floor and bleeding from the head. Cummins said that although he saw or heard no evidence of a third person he had no idea whether there might have been other individuals there who had left through another door by the time he was dragged into the room. He asserted that the shorter man shot him and he could only assume that it was the taller person who shot Metz.

Cummins complied with the taller man's order to open a combination safe. He was then asked by that same person to open a second safe. He was hit on the left side of his head with a pistol when he reached for his wallet which contained the combination to the second safe. Cummins said that after he failed twice in his efforts to open the second safe this taller person cocked a pistol, put it to the side of Cummins' head and informed him that if he did not open the safe that time he was a dead man. He succeeded in opening the safe. He was then told to sit on the floor. His wrist was handcuffed to a file cabinet drawer. He heard his assailants scramble up through the ceiling of the office "and then back down on the other side." He pulled himself onto a chair, pulled the file drawer from the cabinet, carried the drawer by its handle to a telephone in the loading dock area, and called the police. After failing to detect a pulse from Myers' neck, he went to the door and waited for help.

Cummins testified that both of the men that he saw were wearing stocking masks which covered their entire heads. Both men wore gloves on their hands. Cummins observed gaps between the sleeve cuffs and the top of the gloves of these persons from which he determined they were black.

James Adcock testified that while working as a plumber on the fourth floor of a building next door to the Bell store, at approximately 7:00 a.m. on March 27, 1981, he looked out the window and saw two black males running across the parking lot. He said they "skipped" over a fence, jumped over

a wall and went into a parked "brown or maroon-looking car" that then drove away.

Evidence to connect Calhoun with the crime included that of an accomplice who testified pursuant to a plea agreement. His testimony included a description of an attempt by him and another to break into the Bell store through the roof shortly after midnight on the morning of this incident. They were frightened away when they noticed someone watching them with a flashlight from across the parking lot. He related how later, in the early hours of that morning, he and his associates encountered Calhoun, discussed the hole they had put in the Bell roof, and worked out a plan for entering the store. They then waited for the manager to arrive so that the robbery could be effected. He described the operation in detail including mention of weapons, a description of the stocking masks used and their source, and testimony as to the amount of money taken and its division. There was substantial other evidence adduced in addition to that of the accomplice including testimony concerning casts made of footprints found in the area. Two of these casts matched one of the shoes of the accomplice.

Other relevant facts will be set forth as we review the points raised.

### ii Hypnotically enhanced testimony

Lt. James Roby of the Montgomery County Police Department was asked to conduct hypnotic interviews with Adcock and Cummins to ascertain if they could recall any details of the crime which they had not previously related to the police. Adcock was hypnotized on the day of the crime. Cummins was hypnotized on April 13. An audiotape recording was made of the hypnotic session with Adcock. The session with Cummins was placed on video tape. Dr. David Stern, a licensed clinical psychologist whose qualifications we mentioned in *Collins,* 296 Md. 670, and *Metscher,* 297 Md. 368, compared Adcock's and Cummins' prehypnosis statements with the tapes of their hypnotic sessions and concluded that hypnotically enhanced memory was not present as to either Adcock or Cummins.

Prior to hypnosis Adcock made statements to three different police officers. He set forth what he observed while working as a plumber in a building next to the Bell store. He described two black males, apparently teenagers, whom he saw running across the parking lot toward a car. On one occasion he pointed to a burgundy colored Datsun 310 and said the vehicle looked very similar to the one he had seen. On another occasion he indicated that the car in question was a dark, chocolate brown, Honda-type, "sawed-off" foreign car. He described where it was parked. His posthypnotic testimony at the motion to suppress hearing was consistent with the prehypnotic testimony.

Cummins was first interviewed on the morning of the incident while being prepared for surgery. He was interviewed twice the day after surgery and again on April 2. He described in substantial detail the incidents in question. On April 6, a photographic array of seven pictures was exhibited to Cummins. At first he said he could not identify anyone. Later he touched the photograph of Calhoun and said that the shape of the head was very similar to that of the taller of his assailants but that he would be better able to tell if he had a full view of the person. Subsequently, he tapped Calhoun's photograph and said that of the seven, "that's who I'd put my money on." His posthypnotic testimony at the hearing on the motion to suppress was consistent with the interviews.

The trial judge stated in pertinent part relative to the motion to suppress Adcock's and Cummins' testimony:

"I further find that [the hypnotist] was objective in the application of the technique; that he did not suggest by leading questions or interrogation what the answer should or should not be. I further find that if it is not the test, that it certainly should be. You do not go merely on the episode itself. You should have somewhat of what I will refer to as a self-verification or self-corroboration, and that is statements that were made prior to the hypnosis and what statements were made during hypnosis. If

there is a discrepancy between the two, then there must be a determination by the trier of fact as to whether or not those discrepancies were introduced in some manner by hypnosis, and may in fact be confabulation to the extent therefore the witness should not be allowed to testify.

"If that were true that should not preclude the witness from being allowed to testify or some testimony as to their factual recitation prior to hypnosis. How that is accomplished in a case by case basis may present some substantial difficulty.

"The next question was post hypnotic suggestion employed. There has been no suggestion — post hypnotic suggestion other than relaxation of the witness, indeed in both of the witnesses. I don't know why in the world Mr. Adcock needed to be relaxed. Apparently he was never relaxed from the hypnosis. He didn't vary one degree. I find no evidence of post hypnotic suggestion. I find the absence of post hypnotic suggestion.

"I find from observing the tape that when compared with the statements given prior to the hypnotic episode, that there has been no suggestive or confabulation during the hypnotic episode, and therefore, that Mr. Cummins should not be precluded from testifying; that the fact that he was hypnotized goes to the weight to be given by the jury as to that question. It therefore is going to require the availability of all of the expert's testimony before the trier now, the trier of fact, the jury, and although the Court suggests that it is a trial court's obligation to produce those witnesses for the defendant or before the jury, it would not appear that I could call them as Court witnesses over the objection of the defendant, because it could well have a reverse effect, that if the jury were to hear the fact that the witness was hypnotized, and believe that hypnosis in fact made it more likely

that he was telling the truth, it would be detrimental to the defendant.

"In any event I think the fact that hypnosis was used should be fully exposed as was done in Martin. So it leads up to the motion to declare Mr. Adcock and Mr. Cummins incompetent per se to testify, the Court denies that motion."

In his brief and at oral argument Calhoun makes much of the fact that at one point prior to hypnosis, when asked if he could identify either individual, Cummins said, "To be honest, I doubt it[,]" but "[a]t trial, however, he identified [Calhoun] without hesitation as the only person inside the cash office when the door opened." This overlooks the fact that prior to hypnosis he selected the picture of Calhoun and indicated he would put his money on it as that of his assailant.

Maryland Rule 886 provides:

"When an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

That rule is applicable to the trial judge's determination that there was no significant variance between the prehypnotic and posthypnotic statements of Adcock and Cummins. We do not find the determination of the lower court in that instance to be clearly erroneous.

We considered the whole matter of hypnotically enhanced testimony in *Collins*, 296 Md. 670. We concluded:

"We see no reason why a person should not be permitted to testify in court in accord with statements which it clearly can be demonstrated he made prior to hypnosis. Such is not then hypnotically enhanced testimony. This seems to be in

accord with the majority view. We do not go so far as to spell out the exact procedures which must be followed to clearly demonstrate that such statements were made prior to hypnosis. One method certainly might be to follow the guidelines laid down by the Arizona court in *[State ex rel.] Collins [v. Superior Court, etc.],* 132 Ariz. 180, 210, [644 P.2d 1266 (1982),] which we have heretofore quoted. Since one cannot possibly envision all possible situations in which statements prior to hypnosis might be demonstrated to accord with posthypnotic testimony, we deem it wise not to attempt to spell out each and every condition or possibility for demonstrating reliability. To do otherwise is to risk omission of acceptable solutions which do not occur to us." 296 Md. at 702-03.

It was clearly demonstrated that the Cummins and Adcock testimony did not depend upon hypnosis. Cummins identified Calhoun's photograph prior to hypnosis. Even if he had made no courtroom identification of Calhoun his extra-judicial identification would have been admissible in evidence. *Bedford v. State,* 293 Md. 172, 177, 443 A.2d 78 (1982); *Johnson v. State,* 237 Md. 283, 291, 206 A.2d 138 (1965).

When this case was tried the trial court and counsel did not have available what we have said in *Collins.* It is noteworthy, however, that an audiotape was made of the hypnotic interview of Adcock and a video tape made of the hypnotic interview of Cummins. Moreover, tape recordings were made of some but not all of the prehypnotic interviews with Cummins.

The trial judge's ruling here was in accord with *Collins.*

### iii Refusal to strike a juror for cause

Calhoun contends that the trial court erred and abused its discretion in refusing to strike for cause juror 58. When the jurors were interrogated on their voir dire as to whether

they, their families or friends had been the victims of crime, juror 58, Ralph DeMarco, responded that his wife's wallet was stolen the year before on L Street in Washington, D. C., that his wife's parents and the DeMarcos' next door neighbors both were burglarized within the previous two years, and that a close friend was robbed at gunpoint on Connecticut Avenue about two years before. He was asked, "As a result of any of those instances, would that in any way affect your ability to be a fair and impartial juror in this case?" He responded in the negative.

Later DeMarco was questioned individually as to his prior knowledge of the case. He replied:

> "I read the accounts of people being apprehended a few months ago. I remember a few things about him. I can't remember anything specifically about this particular defendant. . . . I think one of them had been in prison. One had a girlfriend who he claimed was an alibi. She refused to give him an alibi. It may have referred to some other trial. I think it was this case."

He earlier had been asked whether he had "any feelings on today's criminal justice system, the courts, crime, sentencing and defendants' rights." He stated, "I think that a lot of people are being let off. Most crimes, I think, are committed by repeater offenders and that sort of thing." DeMarco affirmed that he could be "a fair and impartial juror in deciding this particular case only on the facts and evidence presented." The trial judge overruled a challenge for cause. One of Calhoun's peremptory challenges was then exercised. Calhoun contends that the refusal of the trial judge to grant his challenge for cause effectively reduced the number of his peremptory strikes from twenty to nineteen.

There is both a short and a long answer to Calhoun's contentions. The short answer is that counsel said, "[W]e are satisfied[,]" after the last juror was sworn subsequent to the exhaustion of Calhoun's peremptory challenges. The State then announced its satisfaction. Thus, the point is waived.

*Glover, Robinson & Gilmore v. State,* 273 Md. 448, 452-53, 330 A.2d 201 (1975). However, because of the nature of the case we shall give the "long answer" to Calhoun's contentions.

What the Supreme Court said in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L. Ed. 2d 751 (1961), has significance here:

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies v. Illinois,* 123 U.S. 131; *Holt v. United States,* 218 U.S. 245; *Reynolds v. United States,* [98 U.S. 145]." 366 U.S. at 722-23.

Chief Judge Alvey spoke in a similar vein for this Court in *Garlitz v. State,* 71 Md. 293, 18 A. 39 (1889). The accused in that case was convicted of the first degree murder of his wife on one of the public streets of Cumberland. Three jurors indicated that they had formed an opinion as to the guilt or innocence of the accused based upon newspaper accounts and rumor. Each of them, however, indicated that he could give the accused a fair and impartial trial according to the evidence that might be adduced at the trial. Chief Judge Alvey said for the Court:

"All persons accused of crime are entitled, as matter of right, to be tried by a fair and impartial jury, selected according to law. About this there can be no question. But the question is constantly presented in practice, by what standard or test is the condition of the mind to be tried, in order to obtain with reasonable certainty, the requisite degree of fairness and impartiality in those called upon to serve as jurors? In this age of intelligence and universal reading, with newspapers in the hands of every man with sufficient intelligence to qualify him to sit upon a jury, to require that jurors shall come to the investigation of crime committed in their community, no matter how notorious or atrocious it may be, with minds wholly unaffected or unimpressed by what they may have read or heard in regard to it, is simply to maintain a rule or standard by which every man who is fit to sit upon a jury may be excluded. Many crimes are committed under circumstances of such flagrant atrociousness as to impress and shock the whole community, the ignorant as well as the intelligent; and if such rule of exclusion were applied, it would, in many cases, render the impaneling a jury impossible. Such state of things could never be contemplated by the law. All men, by natural instinct, are supposed to be more or less biased against crime in the abstract; and every member of the community, against which crime has been committed, is naturally interested and impressed with the circumstances of crimes of atrocious character. But the natural bias, however atrocious the crime, can never be regarded as a sufficient cause for the disqualification of the juror. The intellectual, as well as the moral impressions, produced by the reading or hearing of reports or statements of facts in regard to the commission of crime are such that intelligent minds cannot resist; indeed, in many cases the mind receives the impressions from such statements intuitively. But these

impressions, with intelligent, fair minded men, are always of a hypothetical nature, resting upon the supposition of the truth of what they have read or heard. The minds of such men always remain open to the correction of former impressions, and remain entirely impartial, with power to hear and determine upon the real facts of the case, without the least bias in favor of former impressions, whatever they may have been. And therefore, in our present state of society, all that can be required of a juror, to render him competent, is, that he shall be without bias or prejudice for or against the accused, and that his mind is free to hear and impartially consider the evidence, and to render a verdict thereon without regard to any former opinion or impression existing in his mind, formed upon rumor or newspaper reports. Whenever it is shown that such is the state of mind of the juror, he should be held to be competent; and such is the rule as laid down by this court in *Waters v. State,* 51 Md. 430 [(1879)]. In that case it was said 'that the opinion which should exclude a juror must be a fixed and deliberate one, partaking in fact of the nature of the pre-judgment.'" 71 Md. at 299-300.

*Garlitz* was quoted at length for the Court by Judge Hammond in *Grammer v. State,* 203 Md. 200, 211-12, 100 A.2d 257 (1953), *cert. denied,* 347 U.S. 938 (1954), and again by Judge Barnes for the Court in *Bristow v. State,* 242 Md. 283, 288-89, 219 A.2d 33 (1966). *See also Green v. State,* 49 Md. App. 1, 3, 430 A.2d 1122 (1981); *Worthen v. State,* 42 Md. App. 20, 45, 399 A.2d 272 (1979).

More recently Chief Judge Murphy said for the Court in *Couser v. State,* 282 Md. 125, 383 A.2d 389, *cert. denied,* 439 U.S. 852 (1978):

"It is true, of course, that the due process clause of the fourteenth amendment and Article 21 of the Maryland Declaration of Rights guarantee the

right to an impartial jury to an accused in a criminal case; these constitutional guarantees do not, however, insure that a prospective juror will be free of all preconceived notions relating to guilt or innocence, only that he can lay aside his impressions or opinions and render a verdict based solely on the evidence presented in the case. *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L. Ed. 2d 751 (1961); *Newton v. State,* 147 Md. 71, 127 A. 123 (1924); *Garlitz v. State,* 71 Md. 293, 18 A. 39 (1889)." 282 Md. at 138.

In *Kujawa v. Baltimore Transit Co.,* 224 Md. 195, 167 A.2d 96 (1961), Judge Horney said for the Court:

"A juror to be competent need not be devoid of all beliefs and convictions. All that may be required of him is that he shall be without bias or prejudice for or against the parties to the cause and possess an open mind to the end that he may hear and consider the evidence produced and render a fair and impartial verdict thereon. *Garlitz v. State,* 71 Md. 293, 18 [A.] 39 (1889)." 224 Md. at 201.

In *Brown v. State,* 220 Md. 29, 150 A.2d 895 (1959), Judge Hammond said for the Court:

"All the jurors had already said that they had not formed or expressed any opinion as to the guilt or innocence of the accused, and the fact that a prospective juror has read or heard accounts concerning the accused or the crime does not of itself disqualify him or raise any presumption of prejudice. *Bryant v. State,* 207 Md. 565, 577-579; *Piracci v. State,* 207 Md. 499, 511-512; *Grammer v. State,* 203 Md. 200, 209." 220 Md. at 34.

Calhoun does not tell us that the juror in question was asked, "If you are not satisfied of the defendant's guilt even if you felt maybe he probably did it or you suspected he probably did it, would you nonetheless vote for acquittal?" He replied in the affirmative.

We perceive no error upon the part of the trial judge.

### iv Approver

Calhoun has seized upon Code (1957) Art. 27, § 635 which states:

> "No conviction or attainder shall work corruption of blood or forfeiture of estate; the estate of such persons as shall destroy their own lives shall descend or vest as in case of natural death; if any person be killed by casualty there shall be no forfeiture in consequence thereof; *and approver shall never be admitted in any case whatsoever,* and a sentence of death shall not be executed in less than twenty days after judgment." (emphasis added).

With the exception of the fact that the section originally began with the word "that," no change has been made in the statute since its original enactment by Ch. 138, § 10 of the Acts of 1809. That chapter extensively revised the criminal law of Maryland.

By Calhoun's "express direction, it is contended that this provision placed an affirmative obligation on the trial court to bar the testimony of the accomplice Smallwood."

The ancient practice of approver is explained in 4 W. Blackstone, *Commentaries* *329:

> "But there is another species of confession which we read much of in our ancient books, of a far more complicated kind, which is called *approvement.* And that is when a person indicted of treason or felony, and arraigned for the same, doth confess the fact before plea pleaded, and appeals or accuses others, his accomplices, in the same crime in order to obtain his pardon. In this case he is called an *approver* or prover, *probator,* and the party appealed or accused is called the *appellee.* Such approvement can only be in capital offences; and it

is, as it were, equivalent to an indictment, since the appellee is equally called upon to answer it: and if he hath no reasonable and legal exceptions to make to the person of the approver, which indeed are very numerous, he must put himself upon his trial, either by battle or by the country, and if vanquished or found guilty must suffer the judgment of the law, and the approver shall have his pardon *ex debito justitiae.* On the other hand, if the appellee be conqueror or acquitted by the jury, the approver shall receive judgment to be hanged, upon his own confession of the indictment; for the condition of his pardon has failed, viz: the conviction of some other person, and therefore his conviction remains absolute.

"But it is purely in the discretion of the court to permit the approver thus to appeal or not; and, in fact, this course of admitting approvements hath been long disused; for the truth was, as Sir Matthew Hale observes, that more mischief hath arisen to good men by these kind of approvements, upon false and malicious accusations of desperate villains, than benefit to the public by the discovery and conviction of real offenders. And therefore, in the times when such appeals were more frequently admitted, great strictness and nicety were held therein; though since their discontinuance the doctrine of approvements is become a matter of more curiosity than use. I shall only observe that all the good, whatever it be, that can be expected from this method of approvement is fully provided for in the cases of coining, robbery, burglary, house-breaking, horse-stealing, and larceny to the value of five shillings, from shops, warehouses, stables, and coach-houses, by statutes 4 & 5 W. and M. c. 8, 6 & 7 W. III. c. 17, 10 & 11 W. III. c. 23, and 5 Anne, c. 31, which enact that if any such offender, being out of prison, shall discover two or more persons who

have committed the like offences, so as they may be convicted thereof, he shall, in case of burglary or house-breaking, receive a reward of 40 l., and in general be entitled to a pardon of all capital offences excepting only murder and treason; and of them also in the case of coining. And if any such person, having feloniously stolen any lead, iron, or other metal, shall discover and convict two offenders of having illegally bought or received the same, he shall, by virtue of statute 29 Geo. II. c. 30, be pardoned for all such felonies committed before such discovery. It hath also been usual for the justices of the peace, by whom any persons charged with felony are committed to gaol, to admit some one of their accomplices to become a witness (or, as it is generally termed, king's evidence) against his fellows; upon an implied confidence, which the judges of gaol-delivery have usually countenanced and adopted, that if such accomplice makes a full and complete discovery of that and of all other felonies to which he is examined by the magistrate, and afterwards gives his evidence without prevarication or fraud, he shall not himself be prosecuted for that or any other previous offence of the same degree." *Id.* *329-31 (emphasis in original).

See also 1 J. Bishop, *New Criminal Procedure,* §§ 1156-1163 (1895).

In *Whiskey Cases,* 99 U.S. 594, 25 L. Ed. 399 (1879), the Supreme Court explained somewhat relative to approvers:

"Speaking upon that subject, Lord Mansfield said, more than a century ago, that there were three ways in the law and practice of that country in which an accomplice could be entitled to a pardon: *First,* in the case of *approvement,* which, as he stated, then still remained a part of the common law, though he admitted it had grown into disuse by

long discontinuance. *Secondly,* by discovering two or more offenders, as required in the two acts of Parliament to which he referred. *Thirdly,* persons embraced in some royal proclamation, as authorized by an act of Parliament, to which he added, that in all these cases the court will bail the prisoner in order to give him an opportunity to apply for a pardon.

"*Approvers,* as well as those who disclosed two or more accomplices in guilt and those who came within the promise of a royal proclamation, were entitled to a pardon; and the same high authority states that besides those ancient statutory regulations there was another practice in respect to accomplices who were admitted as witnesses in criminal prosecutions against their associates, which he explains as follows: Where the accomplice has made a full and fair confession of the whole truth and is admitted as a witness for the crown, the practice is, if he act fairly and openly and discover the whole truth, though he is not entitled *of right* to a pardon, yet the usage, the lenity, and the practice of the court is to stop the prosecution against the accomplice, the understanding being that he has an equitable title to a recommendation for the king's mercy.

"Subsequent remarks of the court in that opinion showed that the ancient statutes referred to were wholly inapplicable to the case, and that there remained even at that date only the equitable practice which gives a title to recommendation to the mercy of the crown. Explanations then follow which prove that the practice referred to was adopted in substitution for the ancient doctrine of *approvement,* modified and modelled so as to be received with greater favor. As modified it gives, as the court said in that case, a kind of hope to the accomplice that if he behaves fairly and discloses

the whole truth, he may, by a recommendation to mercy, save himself from punishment and secure a pardon, which shows to a demonstration that the protection, if any, to be given to the accomplice rests on the described usage and his own good behavior; for if he acts in bad faith, or fails to testify fully and fairly, he may still be prosecuted as if he had never been admitted as a witness. *Rex v. Rudd,* 1 Cowp. 331; s. c. 1 Leach, 115.

"Great inconvenience arose from the practice of *approvement,* in consequence of which a mode of proceeding was adopted in analogy to that law, by which an accomplice may be entitled to a recommendation to mercy but not to a pardon as of legal right, nor can he plead it in bar or avail himself of it on his trial. 2 Hawk. P. C. n. 3, p. 532; 3 Russ. on Crimes (9th Am. ed.), 596." 99 U.S. at 599-600 (emphasis in original).

In *Byrd v. Commonwealth,* 4 Va. (2 Va. Cases) 490 (1826), the court stated:

"It is a mistake to suppose that the competency of accomplices depends on, or grew out of, the doctrine of approvement. An approver is one who being indicted for treason, or felony, and arraigned, confesses the fact before he pleads, and accuses others, his accomplices, in order to obtain his pardon. His approvement is equivalent to an Indictment, and if he supports it in all respects, and the person accused by him is found guilty, the approver is *entitled* to his pardon, but if he is acquitted, the approver receives judgment to be hanged, upon his own confession of the Indictment. 4 *Bl. Com.* 329; *Rudd's* Case, 1 *Leach,* 115. An accomplice, who voluntarily gives his evidence, is not exonerated from punishment, nor entitled to a pardon, if he succeeds in convicting a fellow prisoner, nor is he subjected to punishment in consequence of his

failure. In both cases, his acquittal, or his conviction, depends on the evidence to be adduced on his own trial. His competency depends on the ancient principle of the Common Law, before averted to, that no person is to be excluded from giving evidence on account of infamy, unless he has been *convicted* of an infamous crime." 4 Va. (2 Va. Cases) at 493 (emphasis in original).

In *Commonwealth v. Dabney,* 40 Va. (1 Rob.) 696, 706 (1842), the court referred to a legislative enactment stating that " 'approvers shall never be admitted in any case whatsoever,' " stating that the legislature had thus "manifested its disapprobation of holding out impunity [sic] to an accomplice, as an inducement to him to become a witness against his associates." The opinion concluded by stating, "[A]n accomplice has no right to demand such a recommendation, merely because he has given evidence on the part of the commonwealth, fully, candidly and impartially." *Id.* at 708. The Court of Special Appeals has had a similar issue before it in *Oliver v. State,* 53 Md. App. 490, 500-03, 454 A.2d 856 (1983).

The statute in question merely made it plain that the practice of approvement would not be permitted in this State. It is not authority for holding that the testimony of an accomplice is not admissible against those with whom he was associated in a criminal act.

## v Three aggravating factors based on identical facts

The jury found three of the aggravating factors spelled out in Maryland Code (1957, 1982 Repl. Vol.) Art. 27, § 413 (d): that the victim was a law enforcement officer who was murdered while in the performance of his duties; that the defendant committed the murder in furtherance of an escape from or an attempt to escape from or evade the lawful custody, arrest or detention of or by an officer or guard of a correctional institution or by a law enforcement officer; and

that the defendant committed the murder while committing or attempting to commit robbery. It is argued:

> "It is obvious that three aggravating factors were being urged from a single fact pattern. The practical effect of this is that in virtually every instance involving the murder of a police officer there will be two or three aggravating factors simply because it is unlikely that a police officer will be shot during the performance of his duties unless the shooter is attempting to evade arrest for some other crime. To allow such a procedure defeats the purpose of separate aggravating factors, which is to provide the possibility of enhanced punishment on the basis of discrete instances of specified conduct." (footnote omitted).

Calhoun cites *State v. Rust,* 197 Neb. 528, 538, 250 N.W.2d 867, 874 (1977), for the proposition that "it is not reasonable to construe the definitions in such a manner as to make them overlap and make the same identical facts constitute two aggravating circumstances." He also asserts, citing *Clark v. State,* 379 So. 2d 97 (Fla. 1979), that "it has been held that where a murder is committed in the course of a robbery where money is taken only one of the two aggravating factors of murder in the course of robbery and murders for pecuniary [gain] may be applied." From this it is asserted:

> "The evidence in this case arguably showed that the murder in this case was committed under circumstances which permitted the possibility of enhancement of the punishment from life imprisonment to death. However, there was no basis for permitting the pyramiding of aggravating factors based on precisely the same act. Such a procedure increases the chance of imposition of capital punishment without showing conduct any more dangerous or antisocial than would be present for a single aggravating factor."

The statement attributed to *Clark* is correct. The statement attributed to *Rust* is likewise correct but it is of interest to note the next succeeding paragraph:

"We believe the Legislature intended by each definition to convey a different concept, at least to the extent that some added different and important element, e.g., motive or purpose, is included in each separate definition even though some fact or facts in a particular case may pertain to more than one of the definitions, e.g., pecuniary gain may be the result." 197 Neb. at 538.

As the State argues, the protection of police officers is a valid societal objective. This is promoted by the first aggravating circumstance in this case. As to the second aggravating factor, that of committing a murder in furtherance of an escape, it can be seen that this could apply to the murder of a civilian just as easily as to the murder of a police officer. In fact, that is precisely the situation which existed in *Rust.* By the same token, the murder of a police officer is not necessarily limited to an escape situation. An individual might be on the prowl with the objective of shooting down a police officer because of a past actual or fancied grievance or, as the State suggests, a roof top sniper, selecting randomly, could make a police officer a victim. The added element here is the conduct of attempting to escape apprehension, which justifies the use of both aggravating factors.

The third aggravating factor, murder committed during the commission of a robbery, does not need a law enforcement officer as a victim. It likewise does not need to be committed during an escape from lawful custody. The General Assembly through this aggravating factor seeks to deter a robbery.

An example of overlapping aggravating factors is found in *State v. Goodman,* 298 N.C. 1, 257 S.E.2d 569 (1979). There the statutory "(e) (4)" factor was that "[t]he capital felony was committed for the purpose of avoiding or preventing a

lawful arrest. . . ." N.C. Gen. Stat. § 15A-2000 (e) (4) (1980). The "(e) (7)" factor was that the "felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." *Id.* § 15A-2000 (e) (7). These have more of a similarity than do the factors at issue in the case at bar. In that instance the court said:

> "In submitting the issue under (e) (4), the court reviewed the evidence tending to show that on the night in question while defendant, Lois, Charles and Collins were on Rural Paved Road 2007 in Cumberland County, that Collins was shot and received some cuts to his body; that defendant and Charles then made statements to the effect that they did not want to be arrested for anything; and that they therefore proposed to take Collins to Robeson County so that he could not tell on them. The court then instructed the jury that if they found those to be the facts beyond a reasonable doubt, and believed that to be an aggravating circumstance, then they should answer the issue 'yes'.

> "In submitting the issue under (e) (7), the trial court reviewed substantially the same evidence. The court then instructed the jury that if they found those to be the facts beyond a reasonable doubt and believed that to be an aggravating circumstance, then they should answer the issue 'yes'.

> "We think the submission of the two issues on the same evidence was improper. This amounted to an unnecessary duplication of the circumstances enumerated in the statute, resulting in an automatic cumulation of aggravating circumstances against the defendant." 298 N.C. at 28-29.

The court went on to say in that case:

> "We do not intend to imply that the aggravating circumstances enumerated in G.S. 15A-2000 (e) can never overlap or that more than one of them can

never arise from a single incident. We realize that in some cases the same evidence will support inferences from which the jury might find that more than one of the enumerated aggravating circumstances is present. This duality will normally occur where the defendant's motive is being examined rather than where the state relies upon a specific factual element of aggravation." 298 N.C. at 30.

In its determination of facts the jury might well have found that there was no attempt to apprehend and therefore no escape from apprehension. Moreover, the General Assembly was entitled to make the legislative judgment as to capital punishment that such facts could and should be considered as aggravating factors. It was not error to submit each aggravating factor to the jury for consideration.

### vi Alleged error in not instructing the jury as to the procedure if it could not agree

Art. 27, § 413 (k) (2) provides, "If the jury, within a reasonable time, is not able to agree as to sentence, the court shall dismiss the jury and impose a sentence of imprisonment for life." Section 413 (c) (3) provides:

"After presentation of the evidence in a proceeding before a jury, in addition to any other appropriate instructions permitted by law, the court shall instruct the jury as to the findings it must make in order to determine whether the sentence shall be death or imprisonment for life and the burden of proof applicable to these findings in accordance with subsection (f) or (h)."

From this Calhoun argues that the trial judge erred in this instance because the trial judge did not instruct the jury that if they could not agree within a reasonable time a life sentence would be imposed.

As in subsection iii of this opinion, there is a short and a long answer to Calhoun's contention. The short answer is

that no request for such instruction was made at trial nor was any objection made upon that basis to the instructions which were given as required by Rule 757 (f). Rule 757 (h) provides that an objection is not reviewable as of right unless it is made in compliance with Rule 757 (f). We are urged that we should take cognizance of this as "plain error" within the meaning of Rule 757 (h). In *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980), we indicated that an appellate court should take cognizance of unobjected to error only when the error is so "compelling, extraordinary, exceptional or fundamental [as] to [deny] the defendant a fair trial." There is no such error in this case. Because this is a capital case in which we are affirming a sentence of death, however, we shall give the long answer to Calhoun's contention.

In this case the jury deliberated for two and a half hours. It then advised the court that it " 'need[ed] a time for individual reflection and therefore request[ed] adjournment overnight or until whenever the Court decide[d].' " This request was made at 5:33 p.m. The court answered by advising that they must remain together but if they desired to suspend and go to dinner that would be an appropriate time. They advised they would like to go to dinner. They were excused for dinner. Court recessed until 7:30 p.m. The jury returned with a verdict at 9:15 p.m.

The Supreme Court of South Carolina recently considered such an issue in *State v. Copeland,*   S.C.   , 300 S.E.2d 63 (1982), *cert. denied,*   U.S.   , 103 S. Ct. 1802 (1983):

> "Appellant Copeland argues the trial judge erred in denying his request to instruct the jury of the actual effect of failure to reach a unanimous agreement as to the punishment, and in instructing the jury that unanimity is required before a life sentence can be imposed. Copeland asserts the judge misstated the applicable law and inserted an arbitrary factor into the jury's sentencing decision by instructing 'irrespective of what your verdict or recommendation is, it must be unanimous on each

count, that is, your verdict or recommendation must be the verdict or recommendation of all twelve of you.' Allegedly, this instruction might affect the jury's decision to impose life or death unless the jury is instructed that, in the event all cannot agree on a recommendation as to whether the death penalty should be imposed, the trial judge shall dismiss the jury and sentence the defendant to life imprisonment. We disagree.

"The trial judge correctly stated the applicable law. We stated in *State v. Adams* [277 S.C. 115], 283 S.E.2d [582,] 587 [(1981)]:

The language of [§ 16-3-20 (C)] provides that where a sentence of death is not recommended by the jury, a life sentence must be given. The situation implicitly envisioned here is that normally the jury will unanimously either recommend life or death. The undecided jury is the exception. That portion of the statute addressing the legal effect given to the existence of an unalterably divided jury is addressed to the trial judge only and need not be divulged to the jury.

There is no error present." S.C. , 300 S.E.2d at 70-71.

Giving the instruction to the jury before deliberation could prompt someone to hold out for just a bit more than a reasonable time to insure that the death penalty was not imposed. It likewise could cause a jury to rush through its deliberations to avoid being called back by the court and told that because a reasonable time had passed without a verdict the sentence would be life imprisonment. The statute is a mandate directed to the court, not the jury. As the jury here reached its decision within a reasonable time, no instruction was required.

### vii Opening statement

At the sentencing phase of the trial defense counsel in his opening statement to the jury said, "There can be in this proceeding no hung jury because if the jury is not able to decide —." This brought an immediate objection. His co-counsel responded that that was the law. This produced another objection, after which the trial judge said, "I don't think that has anything to do with an opening statement or factual [recitation]." The trial judge was correct. The purpose of an opening statement is to orient the jurors so that they can follow and understand the evidence as it unfolds during the trial. It is not the purpose of an opening statement to argue the merits of the case or to discuss the pertinent law. 3 *Wharton's Criminal Procedure* §§ 493, 494 (12th ed. C. Torcia, 1975).

### viii Evidence at sentencing hearing of misconduct at Montgomery County Detention Center

Calhoun takes exception to evidence admitted in the sentencing proceeding relative to an incident at the Montgomery County Detention Center in August 1981. The shift commander at the center, Sergeant Gary Hunt, was called as a witness. The record then states:

"Q   Sergeant Hunt, I would like you to go back to August in 1981 and ask you if sometime in that month you had a confrontation with the defendant?

"MR. TOWNSEND: I object. It's no relationship to any of the specifications of aggravating circumstances under the circumstances.

"THE COURT: Overruled.

"I will allow it on the question of whether or not it poses a danger.

"MR. TOWNSEND: As a mitigating circumstance?

"THE COURT: No, as the circumstances which the State may establish under Article 27, Section 413(c)3.

"MR. TOWNSEND: The only reason I make the point, Your Honor, it's my understanding that the consent [sic] of dangerousness in the statute comes in as non-dangerousness as a mitigating circumstance.

"MR. HAMILTON: [1] I think the State, however, is entitled to disprove the existence of any mitigating factors set out in the statute. As long as he is provided a fair opportunity to rebut it, I'll allow."

The correctional officer related that on August 17 he went to the cell of Calhoun "to read Mr. Calhoun a notice of institutional infraction, a violation of jail rules." The record then is:

"A   ... Before I could say much of anything, Mr. Calhoun made a remark to me as —

"Q   Do you know what he said?

"A   Yes. He said quote unquote, he said 'Get that shit out of my cell.' I presumed he meant the paper in my hand. He rose from his bunk upon which he had been sitting and took a plastic bottle, a Wella-Balsam bottle used for hand lotion and squirted me in the face and arms and chest with a foul concoction which we later learned to be a mixture of urine and [feces]. It hit me and hit the officer standing with me at the entrance of his cell. And we retreated from his cell at that point.

"Q   Is that the end of the incident?

"A   No, it was not.

   We determined that his continued possession of that bottle of substance posed a danger to any officer who might have occasion on that shift or some subsequent shift to approach his cell. And we

---

1. Mr. Hamilton was the prosecutor. This is an obvious error on the part of the stenographer who either meant "The Court" or omitted to specify "The Court" before the last sentence.

decided to go in and ask him for it and give him an
opportunity to be handcuffed and have himself
searched. And he refused to cooperate with our
efforts.

"Q   Did he do anything else with the bottle?

"A   Yes.

When we approached his cell, we told him what
we expected of him. We gave him an opportunity to
be handcuffed peacefully, to submit to a cell search
and a body search, strip search. And he refused to
do so. In fact, as we did so, he continued to squirt the
same stuff from the same bottle on us again. At that
time, we used chemical mace as we had previously
warned that we would do."

Evidence admissible in a sentencing proceeding is set
forth in Code (1957, 1982 Repl. Vol.) Art. 27, § 413 (c) (1):

"(i) Evidence relating to any mitigating circum-
stance listed in subsection (g);

"(ii) Evidence relating to any aggravating cir-
cumstance listed in subsection (d) of which the
State had notified the defendant pursuant to § 412
(b);

"(iii) Evidence of any prior criminal convictions,
pleas of guilty or nolo contendere, or the absence of
such prior convictions or pleas, to the same extent
admissible in other sentencing procedures;

"(iv) Any presentence investigation report. How-
ever, any recommendation as to sentence contained
in the report is not admissible; and

"(v) Any other evidence that the court deems of
probative value and relevant to sentence, provided
the defendant is accorded a fair opportunity to rebut
any statements."

This incident could not pertain to any aggravating circum-
stance set forth in the statute. The mitigating circumstance
set forth in § 413 (g), relevant to this proceeding, is subsec-

tion (1), that "[t]he defendant has not previously (i) been found guilty of a crime of violence; (ii) entered a plea of guilty or nolo contendere to a charge of a crime of violence; or (iii) had a judgment of probation on stay of entry of judgment entered on a charge of a crime of violence." The statute then goes on to define the term "crime of violence" as meaning, "abduction, arson, escape, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence."

Calhoun in his argument to us did not and could not rely upon our recent decision in *Scott v. State*, 297 Md. 235, 465 A.2d 1126 (1983), for the simple reason that it was not decided until some months subsequent to argument in this case, although obviously he could have raised the issue we addressed in *Scott*. As Judge Davidson put it for the Court in *Scott*, that case presented "the question whether, under Maryland Code (1957, 1982 Repl. Vol.) Art. 27, § 413 (c) (1), evidence is admissible at a sentencing proceeding to show that an accused convicted of premeditated murder has committed other unrelated crimes for which the accused has not been convicted or pleaded guilty or nolo contendere." 297 Md. at 242. Scott there claimed, "that under § 413 (c) (1) (i) and § 413 (c) (1) (iii), admissible evidence of unrelated crimes is restricted to evidence of prior convictions, pleas of guilty or pleas of nolo contendere." 297 Md. at 243. The Court took pains in *Scott* to distinguish *Johnson v. State*, 292 Md. 405, 439 A.2d 542 (1982), where we considered, as the Court put it in *Scott*, "whether, under § 413 (c) (1) (v), evidence is admissible at a sentencing proceeding to show that an accused, convicted a premeditated murder, has committed other unrelated crimes for which the accused has not been convicted." *Id.* The Court pointed out that in *Johnson* "[t]he accused . . . did not there contend that under § 413 (c) (1) (i) and § 413 (c) (1) (iii) admissible evidence of unrelated crimes was restricted to evidence of prior convictions, pleas of guilty

or pleas of nolo contendere and consequently that the evidence of the unrelated crime was inadmissible because, although charged with the murder, the accused had not been convicted." 297 Md. at 245. The Court said in *Scott:*

> "Thus, § 413 (c) (1) (iii) establishes a more stringent standard of reliability for the admission of such evidence in a death penalty case than is applied in a nondeath penalty case. It precludes, in a death penalty case, any but the most reliable type of evidence of unrelated crimes — a conviction. Additionally, § 413 (c) (1) (iii) precludes, in a death penalty case, inflammatory detailed evidence of the underlying facts and circumstances surrounding unrelated crimes. As a result, § 413 (c) (1) (iii), like § 413 (c) (1) (i), serves the purpose of moderating the significantly prejudicial nature of evidence of unrelated crimes in the face of the unique severity of the death penalty." 297 Md. at 247.

It is obvious from an examination of the objection of defense counsel that at no time did he raise the issue that was raised in *Scott,* that this was an attempt to elicit information pertaining to a criminal act on the part of Calhoun for which there had been no conviction or disposition tantamount to a conviction. It also can be seen from the record quoted above that the objection was narrowed by defense counsel to whether the incident at the detention center was relevant to "a mitigating circumstance." The court overruled the objection saying that the testimony concerned a circumstance "which the State may establish under Article 27, Section 413 (c)3." The trial judge presumably was referring to § 413 (c) (1) (iii) ("Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures") since § 413 (c) (3) states:

"(3) After presentation of the evidence in a proceeding before a jury, in addition to any other appropriate instructions permitted by law, the court shall instruct the jury as to the findings it must make in order to determine whether the sentence shall be death or imprisonment for life and the burden of proof applicable to these findings in accordance with subsection (f) or (h)."

Counsel made no general objection. His specific objection was that this bore no relationship to the specified aggravating circumstances. In *von Lusch v. State,* 279 Md. 255, 264, 368 A.2d 468 (1977), we said, "[W]here counsel clearly states specific grounds for an objection without a request by the trial court, he waives the right to challenge the evidence on other grounds . . . ." The conduct of Calhoun in this instance, if established in a criminal proceeding against him, would be the common law offense of battery. *See* W. LaFave & A. Scott, *Criminal Law* 604 (1972) and R. Perkins, *Criminal Law* 107 (2d ed. 1969). The record here is silent as to whether Calhoun has or has not been charged and tried as a result of this incident. It is entirely conceivable that had the objection here been based upon the issue before the Court in *Scott,* 297 Md. 235, that the State might well have produced evidence of such a conviction. On the other hand, it might have been obliged to admit that no criminal charges had been brought as a result of the incident or that charges had been brought but the case had not come to trial.

In the absence of an objection focusing on the point before the Court in *Scott,* the evidence here was admissible under Art. 27, § 413 (c) (1) (v), which permits introduction of, "Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements."

ix Constitutional issues

Calhoun launches a broad based constitutional attack. We shall consider his points seriatim.

## A

He first contends that our "capital punishment statute violates the Eighth and Fourteenth Amendments of the U.S. Constitution and Articles 16 and 25 of the Maryland Declaration of Rights in failing to provide standards to govern the exercise of discretion under Article 27, Sec. 412 (b) to initiate a death case."

Calhoun's first basis for his claim of unconstitutionality stems from what he describes as the prosecutor's "unbridled exercise of discretion," referring to Art. 27, § 412 (b). That subsection provides:

> "A person found guilty of murder in the first degree shall be sentenced either to death or to imprisonment for life. The sentence shall be imprisonment for life unless (1) the State notified the person in writing at least 30 days prior to trial that it intended to seek a sentence of death, *and* advised the person of each aggravating circumstance upon which it intended to rely, and (2) a sentence of death is imposed in accordance with § 413." (Emphasis added.)

According to Calhoun the lack of specific standards results in an inconsistent and discriminatory application of the death penalty statute by prosecutors in violation of the limitations set by the Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), and *Gregg v. Georgia,* 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).

The State, on the other hand, argues that the Maryland statutes, specifically § 412, are in accord with *Furman* and *Gregg.* Because of the checks provided by the sentencing authority and the mandatory appellate review, the Supreme Court in *Gregg* and the several opinions filed the same day gave prosecutors wide discretion in charging capital crimes. The State claims also that to apply strict standards would result in the type of mandatory system outlawed by the Supreme Court in *Woodson v. North Carolina,* 428 U.S. 280,

96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976), and *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325, 96 S. Ct. 3001, 49 L. Ed. 2d 974 (1976).

An analysis of the issue begins with *Furman.* There the Supreme Court in a per curiam opinion declared statutes unconstitutional which gave judges and juries uncontrolled discretionary power to impose the death sentence. Although every Justice wrote an opinion in *Furman,* no one specifically attacked the power given to prosecutors in choosing which cases qualified as capital crimes, but rather references were made only to the "sentencing authority."

Subsequently in *Gregg* the specific issue of the prosecutor's discretion was raised by the petitioner, who claimed that the Georgia statute gave the state prosecutor "unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them." 428 U.S. at 199. Justice Stewart, who wrote the plurality opinion for the Court, stated in response:

> "The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman,* in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." 428 U.S. at 199.

In a footnote Justice Stewart made clear that strict standards imposed on a prosecutor would result in an ineffective and unconstitutional system:

"The petitioner's argument is nothing more than a veiled contention that *Furman* indirectly outlawed capital punishment by placing totally unrealistic conditions on its use. In order to repair the alleged defects pointed to by the petitioner, it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital murder and that they refuse to plea bargain with the defendant. . . . Such a system, of course, would be totally alien to our notions of criminal justice.

"Moreover, it would be unconstitutional. Such a system in many respects would have the vices of the mandatory death penalty statutes we hold unconstitutional today in *Woodson v. North Carolina, post,* p. 280, and *Roberts v. Louisiana, post,* p. 325. . . ." 428 U.S. at 199-200 n. 50.

Justice White wrote a concurring opinion in *Gregg* which was joined by the Chief Justice and by Justice Rehnquist. It is of interest to note the analysis of prosecutorial discretion set forth by Justice White:

"Petitioner's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial

charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. This does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt." 428 U.S. at 225.

On the basis of *Gregg,* claims of unconstitutional prosecutorial discretion under *Furman* were rejected in two plurality opinions in death penalty cases written by Justice Stewart filed the same day as *Gregg. Proffitt v. Florida,* 428 U.S. 242, 254, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 274, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976).

We have not specifically dealt with the issue of prosecutorial discretion. However, in *Tichnell v. State,* 287 Md. 695, 720-29, 415 A.2d 830 (1980) *(Tichnell I)* we found that the Maryland statute does satisfy both federal and state requirements on its face.

Absent any specific evidence of indiscretion by prosecutors resulting in an irrational, inconsistent, or discriminatory application of the death penalty statute, Calhoun's claim cannot stand. To the extent that there is a difference in the practice of the various State's attorneys around the State, our proportionality review would be intended to assure that the death penalty is not imposed in a disproportionate manner.

Finally, Calhoun claims that the notice requirement of § 412 differs from "charging" the defendant as discussed by the Supreme Court in *Gregg.* The written notice is a procedure required for the defendant's benefit. It ensures that there are sufficient grounds for the charges and that the defendant has notice of those grounds. The Supreme Court does not require such notice to protect the constitutionality of the death penalty statute. Therefore, the additional formality of § 412 should not be held against the State.

We hold that Code (1957, 1982 Repl. Vol.) Art. 27, § 412 as presently applied does not violate the Eighth and Fourteenth Amendments to the Constitution of the United States or Articles 16 and 25 of the Maryland Declaration of Rights.

B

Calhoun contends that he "is denied due process of law by the failure of the Maryland Capital Punishment Statute, on its face and in its operation, to provide a means of culling those 'similar cases' which this Court must consider under Code (1957, 1982 Repl. Vol.) Art. 27, Sec. 414 (e) (4)."

Calhoun argues that the provision by the General Assembly for proportionality review is unconstitutional because the statute fails to provide this Court with the means to discharge effectively its obligation to review similar cases. In other words, he is contending that the Legislature has failed to provide a means for defining the "relevant universe" of cases that we should consider in determining whether a particular sentence of death is excessive or arbitrary. By Rule 772A we have provided that trial judges in capital cases are to file a report with us in writing. The rule sets forth in substantial detail that which is to be included in the report. Calhoun contends that Rule 772A is inadequate because it fails to identify all relevant cases. He maintains that relevant cases should include not only those in which the State actually sought the death penalty but also those in which the State either withdrew its intent to seek capital punishment or chose not to seek the death penalty even though a case was ostensibly "similar." Finally, he argues that § 414 (e) (4) has deprived him of his due process right to be heard in a meaningful manner: although the statute extends the right to proportionality review, its failure to provide a means to give content to the right results in an effective denial of due process.

The State contends that the purpose of proportionality review is to determine whether the imposition of the death sentence in a particular case is aberrant or irrational. As

long as the death penalty has been imposed under similar circumstances, it is not important that a life sentence was given in another similar case. Further, the State notes that the United States Supreme Court has upheld death penalty statutes containing no provisions for proportionality review. Rather, the Court has stressed that due process and the Fourteenth Amendment require only that the death penalty not be imposed in a "wanton" or "freakish" manner; the type of statute providing for appellate review is not material.

In several cases the Supreme Court has noted the requirement that the death penalty must be imposed in a rational and consistent manner. Although the Court appears not to require proportionality review per se, it does seem to be saying that appellate review of capital punishment cases is essential to the constitutionality of the death penalty statutes. In its recent opinions it has dwelt upon the fact that review by a state's highest court was provided. *See, e.g., Jurek,* 428 U.S. 262; *Proffitt,* 428 U.S. 242; *Gregg,* 428 U.S. 153. Even where the Court has overturned the decision of a state court of last resort on the basis of an inconsistent standard applied in capital punishment cases, it has not articulated specific means by which state courts are to arrive at consistent results. *Cf. Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980) (State must provide sentencing authority " 'clear and objective standards' that provide 'specific and detailed guidance,' and that make 'rationally reviewable the process for imposing a sentence of death.' "). Indeed, it appears that the Supreme Court has left it to the state legislatures and courts to determine the method by which the death penalty is to be imposed in a rational manner.

In *Gregg,* 428 U.S. 153, the petitioner argued that the requirements of *Furman,* 408 U.S. 238, were not met "because the jury has the power to decline to impose the death penalty even if it finds that one or more statutory aggravating circumstances are present in the case." *Gregg,* 428 U.S. at 203. To this the plurality opinion said:

"This contention misinterprets *Furman. See supra,* at 198-199. Moreover, it ignores the role of the

Supreme Court of Georgia which reviews each death sentence to determine whether it is proportional to other sentences imposed for similar crimes. Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice." 428 U.S. at 203.

The plurality opinion in *Gregg* further noted:

"The provision for appellate review in the Georgia capital-sentencing system serves · as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death." 428 U.S. at 206.

*See also Jurek,* 428 U.S. at 276 (opinion of Stewart, J.) (prompt judicial review of jury's sentencing decision acts as a safeguard against the arbitrary and capricious imposition of the death sentence); *Proffitt,* 428 U.S. at 258-59 (same).

Based on the broad and general statements of the United States Supreme Court regarding proportionality review we have articulated the standard we shall apply under the similar cases provision of Art. 27, § 414 (e) (4). *See Tichnell v. State,* 297 Md. 432, 461 A.2d 1 (1983) *(Tichnell III).* The analysis of proportionality review by Chief Judge Murphy in *Tichnell III* basically consists of three parts. First, he

reviewed for the Court the United States Supreme Court cases that have confronted the issue of proportionality review and concluded that "the essential principle underlying the varieties of proportionality review upheld in *Gregg Profitt* and *Jurek* is, in short, the guarantee that death sentences will be imposed in a reasonably consistent manner. *Tichnell [v. State]*, 287 Md. [695,] 741 [, 415 A.2d 830 (1980)]." 297 Md. at 460. Second, Chief Judge Murphy reviewed for the Court the manner in which those states with proportionality review statutes similar to ours have defined the "relevant universe" of cases. 297 Md. at 461-64. Third, the Court concluded:

> "[T]he legislatively intended inventory of cases from which 'similar cases' are to be culled encompasses only those first degree murder cases in which the State sought the death penalty under § 413, whether it was imposed or not. This interpretation of § 414 (e) (4) is consistent with the implementing provisions of Maryland Rule 772A which requires, for purposes of proportionality review, that trial judges file detailed informational reports only in such cases.
>
> "The focus of § 414 (e) (4) is upon capital cases in which the sentencing authority determined whether to impose a life or death sentence; the subsection aims to assure that upon consideration of both the crime and the defendant the aggravating and mitigating circumstances present in one capital case will lead to a result similar to that reached under similar circumstances in another capital case, thus identifying the aberrant sentence and avoiding its ultimate imposition. This, of course, is the constitutional purpose of proportionality review as articulated in *Gregg* and *Proffitt* and as to which we think the General Assembly intended to subscribe in enacting § 414 (e) (4). No case is potentially similar within the contemplation of the statute, therefore, unless the death penalty was an authorized punishment." 297 Md. at 464-65.

The Court restricted the analysis of similar cases to those "decided under constitutional death penalty statutes and to those decided under our own State law." 297 Md. at 466. Finally, we noted that proportionality review will be conducted "in accordance with the fundamental constitutional principle of avoiding the arbitrary or capricious imposition of the death penalty by affording similar treatment to similar capital cases, considering both the crime and the defendant." *Id.*

Under the holding of *Tichnell III,* therefore, Calhoun's contention that § 414 (e) (4) violates due process because of its failure to provide a standard for defining similar cases is unfounded. Rather, from *Tichnell III* and the cases of the Supreme Court of the United States, it appears that similar cases, in terms of a particular accused and particular crime of which he was convicted, are comprised of those involving similar aggravating and mitigating circumstances in which the State sought to have the death penalty imposed and those brought to our attention by defendants.

## C

Calhoun contends that our death sentence statute "is unconstitutional because Article 23 of the Declaration of Rights denies this Court the power to exercise the review mandated by Article 27, Sec. 414 (e)."

Calhoun argues that because Article 23 of our Declaration of Rights precludes appellate courts from weighing and balancing the facts of a criminal case, this Court lacks the power to conduct the review authorized by Art. 27, § 414. Article 23 provides in relevant part, "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction." Calhoun's point is that under § 414 we are to independently assess the findings of the sentencing authority concerning the presence or absence of aggravating and mitigating circumstances and to further review similar cases. It is his claim that in doing this we are

going beyond our limited power to determine the sufficiency of the evidence. Thus, he claims that because proportionality review is prohibited by Article 23 and because that provision is a central, nonseverable feature of the capital punishment statute, the entire statute is unconstitutional. In a footnote Calhoun contends that the fact that the appellate review is of a sentence rather than a determination of guilt is inconsequential because we must engage in the same type of factual inquiry.

The State contends that Article 23 applies only to the evidence necessary to sustain a conviction at trial and not to the review of a criminal sentence. Therefore, it says § 414 (e) is a valid exercise of legislative authority and the Court is indeed empowered to conduct the proportionality review.

We first note that most of the cases upon which Calhoun relies were decided prior to the amendment to the Constitution in 1950 giving this Court power to pass upon the sufficiency of the evidence. The issue here was mentioned briefly in *Poole v. State,* 290 Md. 114, 125, 428 A.2d 434 (1981) *(dicta).* We there stated that Article 23 "applies to the trial stage of the proceeding and refers explicitly to the evidence necessary to sustain a conviction. It does not apply to the jury's role in a sentencing proceeding. *See Stevenson v. State,* 289 Md. 167, 423 A.2d 558 (1980)." *Id.*

In *Stevenson* the question before the Court was "whether Article 23 of the Declaration of Rights to the Maryland Constitution, which provides that the jury in a criminal case 'shall be the Judges of Law, as well as of fact,' is unconstitutional because the provision, as construed by this Court, facially deprives a defendant of the federally secured right to due process of law." *Stevenson v. State,* 289 Md. 167, 169, 423 A.2d 558 (1980). In reaching the conclusion that the grant to the jury of the role of "judges of law" in a criminal case did not violate the Fourteenth Amendment, *id.* at 189, Judge Digges made several observations for the Court about the functions of judge and jury. First, he noted that "the jury was not granted, by Article 23, the power to decide all matters that may be correctly included under the generic label — 'law.' Rather, its authority is limited to deciding 'the

law of the crime,' . . . or 'the definition of the crime,' as well as 'the legal effect of the evidence before [the jury].' " *Id.* at 178 (citations omitted; brackets in original). Second, Judge Digges reviewed for the Court various cases that discussed the role, function, and power of the jury to determine "the law" in a criminal case. He noted that "[i]mplicit in the decisions of this Court limiting the jury's judicial role to the 'law of the crime' is a recognition that all other legal issues are for the judge alone to decide." *Id.* at 179.

Because under *Stevenson* the jury is the judge of the law only in the terms of the law or definition of the crime, it follows that the restriction "except that the Court may pass upon the sufficiency of the evidence to sustain a conviction" goes only to the evidence necessary to sustain a finding of guilt or innocence. Thus, the role of the jury being limited and all other matters being left to the judge, it follows that this Court has the power to review the sentencing process in a capital punishment case.

## D

Calhoun claims that "[i]n providing for the sentence of death by administration of lethal gas the Maryland Capital Punishment scheme violates the Eighth and Fourteenth Amendments of the United States Constitution and Articles 16 and 25 of the Maryland Declaration of Rights."

Article 16 of the Maryland Declaration of Rights forbids "inflict[ing] cruel and unusual pains" while Article 25 says that "unusual punishment [shall not be] inflicted . . . ." At issue then is whether the enforcement of our death penalty statute by lethal gas is "cruel and inhuman punishment" as defined by the Federal Constitution and our own Declaration of Rights.

First, under the Eighth and Fourteenth Amendments the Supreme Court has expressly stated that the death penalty is an acceptable form of punishment. In the plurality opinion for the Court in *Gregg*, 428 U.S. 153, Justice Stewart stated:

"The Court on a number of occasions has both assumed and asserted the constitutionality of capital punishment.... But until *Furman v. Georgia,* 408 U.S. 238 (1972), the Court never confronted squarely the fundamental claim that the punishment of death always, regardless of the enormity of the offense or the procedure followed in imposing the sentence, is cruel and unusual punishment in violation of the Constitution. Although this issue was presented and addressed in *Furman,* it was not resolved by the Court.... We now hold that the punishment of death does not invariably violate the Constitution." 428 U.S. at 168-69.

In *Gregg* Justice Stewart further said in the plurality opinion:

"The petitioners in the capital cases before the Court today renew the 'standards of decency' argument, but developments during the four years since *Furman* have undercut substantially the assumptions upon which their argument rested. Despite the continuing debate, dating back to the 19th century, over the morality and utility of capital punishment, it is now evident that a large proportion of American society continues to regard it as an appropriate and necessary criminal sanction.

"The most marked indication of society's endorsement of the death penalty for murder is the legislative response to *Furman.* The legislatures of at least 35 States have enacted new statutes that provide for the death penalty for at least some crimes that result in the death of another person. And the Congress of the United States, in 1974, enacted a statute providing the death penalty for aircraft piracy that results in death." 428 U.S. at 179-80 (footnotes omitted).

It thus seems relevant to comment as to society's view that fourteen out of forty-eight times that the opportunity has

existed to impose the death penalty under our lethal gas statute Maryland juries have done so. Six of the remaining thirty-four times in which life sentences were imposed by juries this result was mandatory by virtue of jury deadlocks. The fact that juries are willing to impose the punishment certainly carries some weight as to society's view of the death penalty as a valid form of punishment.

Later in *Coker v. Georgia,* 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977), Justice White said in the plurality opinion of the Court:

"It is now settled that the death penalty is not invariably cruel and unusual punishment within the meaning of the Eighth Amendment; it is not inherently barbaric or an unacceptable mode of punishment for crime; neither is it always disproportionate to the crime for which it is imposed. It is also established that imposing capital punishment, at least for murder, in accordance with the procedures provided under the Georgia statutes saves the sentence from infirmities which led the Court to invalidate the prior Georgia capital punishment statute in *Furman v. Georgia, supra."* 433 U.S. at 591.

It must not be forgotten that, as pointed out by the Chief Justice in his dissent in *Furman v. Georgia,* 408 U.S. 238:

"[I]t is . . . clear from the language of the Constitution itself that there was no thought whatever of the elimination of capital punishment. The opening sentence of the Fifth Amendment is a guarantee that the death penalty not be imposed 'unless on a presentment or indictment of a Grand Jury.' The Double Jeopardy Clause of the Fifth Amendment is a prohibition against being 'twice put in jeopardy of life' for the same offense. Similarly, the Due Process Clause commands 'due process of law' before an accused can be 'deprived of life, liberty, or property.'

Thus, the explicit language of the Constitution affirmatively acknowledges the legal power to impose capital punishment; it does not expressly or by implication acknowledge the legal power to impose any of the various punishments that have been banned as cruel since 1791. Since the Eighth Amendment was adopted on the same day in 1791 as the Fifth Amendment, it hardly needs more to establish that the death penalty was not 'cruel' in the constitutional sense at that time." 408 U.S. at 380.

No one had heard of death by electrocution or by lethal gas at the time of the adoption of those constitutional provisions. The gallows was the customary method of imposing the death penalty. This was the method in use in Maryland until the more humane method of execution by lethal gas was adopted in 1955. *See* Chapter 625, § 1, Acts of 1955.

The issue now before the Court was considered recently by the Fifth Circuit in *Gray v. Lucas,* 710 F.2d 1048 (5th Cir. 1983). The court said:

"Gray stresses that neither the Supreme Court nor any federal court has addressed the issue whether the gas chamber constitutes cruel and unusual punishment. In cases decided in the last century, however, the court approved New York's use of the electric chair, *In re Kemmler,* 136 U.S. 436, 10 S. Ct. 930, 34 L. Ed. 519 (1890), and Utah's use of hanging and the firing squad, *Wilkerson v. Utah,* 99 U.S. 130, 25 L. Ed. 345 (1879). In this century, a number of states have upheld the use of the gas chamber. *Duisen v. State,* 441 S.W.2d 688, 693 (Mo. 1969), *modified by Furman v. Georgia,* 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972); *People v. Daugherty,* 40 Cal. 2d 876, 256 P.2d 911, *cert. denied,* 346 U.S. 827, 74 S.Ct. 47, 98 L. Ed. 352 (1953); *State v. Jon,* 46 Nev. 418, 211 P. 676 (1923). See also *In Re Anderson,* 69

Cal. 2d 613, 73 Cal. Rptr. 21, 447 P.2d 117, 130 (1968), *cert. denied,* 406 U.S. 971, 92 S. Ct. 2415, 32 L. Ed. 2d 671 (1972). This year, the state of Nevada enacted a statutory provision which abandoned the gas chamber in favor of lethal injection. Nev. Rev. Stat. § 176.355 (1983). Nevada thus joins New Mexico in abandoning the gas chamber in favor of lethal injection. N.M. Stat. Ann. § 31-14-11 (1979). North Carolina allows death-row prisoners to choose between lethal injection or the gas chamber. In 1981, the State of Washington banned further use of hanging as a method of execution. *State v. Frampton,* 95 Wash.2d 469, 627 P.2d 922 (1981).

"Gray argues strongly that he has produced a factual predicate clearly demonstrating that death by cyanide gas, causing asphyxiation at the cost of protracted pain over a period that may exceed seven minutes, may offend an indicated eighth amendment prohibition against the unnecessary and wanton infliction of pain. He contends that, therefore, he is entitled to an evidentiary hearing to prove the facts indicated in order to vindicate his constitutional claim in that regard.

"Accepting Gray's proffered facts as proven, we ultimately conclude that they do not as a matter of law establish the eighth amendment claim asserted by him and, therefore, no evidentiary hearing is required. Traditional deaths by execution, such as by hanging, have always involved the possibility of pain and terror for the convicted person. Although contemporary notions of civilized conduct may indeed cause some reassessment of what degree or length is acceptable, we are not persuaded that under the present jurisprudential standards the showing made by Gray justifies this intermediate appellate court holding that, as a matter of law or fact, the pain and terror resulting from death by cyanide gas is so different in degree or nature from

that resulting from other traditional modes of execution as to implicate the eighth amendment right." 710 F.2d at 1060-61 (footnote omitted).

We reject this contention of Calhoun.

## E

Calhoun next contends that "[b]ecause an assessment of [Calhoun's] 'future dangerousness' was a statutory factor relied upon by the sentencing body below, the Maryland Capital Punishment Statute is unconstitutional in its application in this case." He says:

"Article 27, Sections 413 (c) (1) (i) and (g) (7) permit the introduction of evidence of a defendant's unlikeliness of engaging 'in further criminal activity that would constitute a threat to society,' as a mitigating factor. These sections are unconstitutional as applied in this case under the Eighth and Fourteenth Amendment Rights, and Art. 25 of the Maryland Declaration of Rights."

It is Calhoun's contention that, under the Eighth Amendment and Article 25 of our Declaration of Rights the procedural limits applied in determining the type and degree of punishment to be imposed are greater in capital sentencing proceedings than in other sentencing proceedings. That is, they mandate a higher quality of evidence. In this case Calhoun contends that the evidence introduced at the sentencing hearing to demonstrate his propensity for future dangerousness was highly speculative, unreliable, and inconclusive, and that such evidence does not provide a legal basis for distinguishing those cases in which the death penalty should be imposed. From this stems his contention that the introduction of this evidence violated his constitutional rights. He cites various psychiatric studies that illustrate the speculation involved in labeling a person as having a propensity toward violence: most persons determined to be violent recidivists prove not to be involved in subsequent

acts or incidents of violence. He maintains that the evidence or testimony of the guard considered in viii, *supra,* not only failed to establish his future dangerousness, but also served as a nonstatutory aggravating circumstance that inflamed and prejudiced the jury.

The State, on the other hand, argues that nothing in the record of the sentencing proceeding indicates that the jury considered propensity toward violence as a factor in determining Calhoun's sentence. Nevertheless, it concedes that the evidence concerning Calhoun's behavior at the Montgomery County Detention Center was introduced for the purpose of illustrating that not even incarceration of Calhoun would prevent him from engaging in future criminal acts. The State further contends that expert psychiatric testimony is not required for a jury to be able to evaluate the significance of the guard's testimony and to determine that Calhoun was not entitled to a finding of an absence of propensity for future violence as a mitigating factor.

In several cases concerning the death penalty the Supreme Court has stated that the sentencing process must provide for determination and consideration of the particular facts at issue as well as the particular character traits and propensities of the defendant. *See, e.g., Zant v. Stephens,* U.S. , 103 S. Ct. 2733, 2743-44, 77 L. Ed. 2d 235 (1983); *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Woodson,* 428 U.S. at 304; *Jurek,* 428 U.S. at 276. The Supreme Court apparently views such a consideration to be an essential feature of capital sentencing procedures which are in compliance with the Eighth and Fourteenth Amendments. For example, in the plurality opinion in *Woodson,* Justice Stewart noted that:

> "This Court has previously recognized that '[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the

offense together with the character and propensities of the offender.' *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. See *Williams v. New York,* 337 U.S., at 247-249; *Furman v. Georgia,* 408 U.S., at 402-403 (Burger, C.J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles,* 356 U.S., at 100 (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." 428 U.S. at 304.

Although several of the Supreme Court cases which stated that the particular offense and particular propensities of the defendant must be reviewed at the sentencing hearing have stressed the necessity of considering factors in mitigation, *e.g. Eddings,* 455 U.S. at 113-15, and *Lockett,* 438 U.S. at 605-06, other decisions have indicated that *all* relevant information, positive as well as negative, is admissible during the sentencing proceeding. It is to be noted that both the Oklahoma and Ohio statutes at issue in *Eddings* and *Lockett* strictly limited the type of evidence admissible in mitigation, unlike the situation prevailing in Maryland. In *Gregg,* 428 U.S. 153, the plurality opinion noted that because information relevant to sentencing often is too prejudicial or irrelevant to the question of guilt, a bifurcated trial procedure best insures that the jury will impose the death sentence in a rational way. The plurality believed that a jury determination of the sentence was desirable in order to maintain a connection between contemporary community standards and the penal system.

Recently in *Barclay v. Florida,* U.S. , 103 S. Ct. 3418, 77 L. Ed. 2d 1134 (1983), the Court upheld the application by the Florida Supreme Court of the doctrine of harmless error to a capital sentencing proceeding in which the trial judge had relied on a nonstatutory aggravating circumstance.[2] The trial judge, in addition to finding four statutory aggravating circumstances, noted that Barclay's extensive prior criminal record itself constituted an aggravating circumstance. *Id.* at 3422. The Florida capital punishment statute's only reference to a prior criminal record appears under the mitigating circumstances: the *lack of* a prior criminal record is a mitigating circumstance. This is similar to the situation we are confronting here: the appellant's propensity for future dangerousness was introduced by the State in order to illustrate to the jury that Calhoun would act in a violent manner while incarcerated and thus that the sentence should not be life imprisonment. The only comparable reference in our capital punishment statute is to a mitigating circumstance as provided in § 413 (g) (7), that the defendant is unlikely to "engage in further criminal activity that would constitute a continuing threat to society." In *Barclay* the Florida court, although noting that the trial judge improperly relied on the defendant's prior criminal record in imposing the death sentence, affirmed the trial judge's sentence on the basis that this constituted harmless error given the presence of several statutory aggravating circumstances. 103 S. Ct. at 3428.

In affirming the decision of the Florida court, the plurality opinion of the Supreme Court first noted that the trial judge's consideration of Barclay's criminal record as an aggravating circumstance was improper as a matter of state law. The trial judge, however, did not consider constitutionally protected conduct nor was such evidence inadmissible under Florida law. "On the contrary, this evidence was properly introduced to prove that the mitigating

---

2. In Florida the sentencing jury only makes a recommendation as to whether the sentence should be death or life imprisonment. The final sentencing authority rests with the trial judge.

circumstance of absence of a criminal record did not exist."
103 S. Ct. at 3427 (Rehnquist, J., wrote the plurality opinion,
joined by the Chief Justice and Justices White and
O'Connor). Further, the plurality cited *Proffitt,* 428 U.S.
242, stating that no constitutional violation existed in a
procedure under which a defendant could receive the death
penalty on the basis of a combination of statutory and
nonstatutory aggravating circumstances. 103 S. Ct. at 3428.
Finally, the plurality stated that the Florida Supreme Court
record illustrated that the harmless error doctrine was not
applied in an automatic or mechanical way in capital pun-
ishment cases. This fact, combined with the Florida court's
practice of reviewing similar cases, mandated a finding of no
constitutional violation. *Id.*

In Justice Stevens' concurring opinion in *Barclay,* joined
by Justice Powell, he said:

> "The Florida rule that statutory aggravating
> factors must be exclusive affords greater protection
> than the federal Constitution requires. Although a
> death sentence may not rest *solely* on a
> nonstatutory aggravating factor, see *Zant v.
> Stephens, supra,* U.S., at , 103 S. Ct.,
> at 2742-2743, the Constitution does not pro-
> hibit consideration at the sentencing phase of infor-
> mation not directly related to either statutory
> aggravating or statutory mitigating factors, as long
> as that information is relevant to the character of
> the defendant or the circumstances of the crime.
> *Zant, supra,* at , , 103 S. Ct., at 2743-2744,
> 2747-2749; *Gregg v. Georgia, supra,* 428 U.S., at
> 164, 196-197, 206, 96 S. Ct., at 2920-2921, 2936,
> 2940-2941; *Proffitt v. Florida, supra,* 428 U.S., at
> 242, 248, 256-257, n. 14, 96 S. Ct. at 2960,
> 2964-2965, 2968-2969, n. 14. As we recently wrote
> in *Zant,* 'What is important at the selection stage is
> an *individualized* determination on the basis of the
> character of the individual and the circumstances of
> the crime.' U.S., at , 103 S. Ct., at

2743-2744." U.S. at , 103 S. Ct. at 3432-33 (emphasis in original).

Thus, both the plurality and concurring decisions in *Barclay* suggest that the introduction of the guard's testimony concerning Calhoun did not violate the Constitution because that evidence was relevant to an "individualized determination" of his character.

In addition to the previously cited cases dealing with the admissibility of evidence about the defendant's character in a capital sentencing proceeding, two Supreme Court cases have confronted directly the question of the propriety of testimony concerning a defendant's future dangerousness. First, in *Estelle v. Smith,* 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981),[3] the Court held that the prosecution's use of psychiatric testimony at a capital sentencing proceeding to establish the defendant's future dangerousness violated the defendant's Fifth and Sixth Amendment rights. The defendant had not consented to the psychiatric examination after being informed of both his right to remain silent and the fact that the evidence could be used against him. *Id.* at 467-68. Further, because this proved to be a critical stage of the proceeding, defendant's right to counsel attached. Despite this holding, the Court noted:

> "[U]nder the Texas capital sentencing procedure, the inquiry necessary for the jury's resolution of the future dangerousness issue is in no sense confined to the province of psychiatric experts. Indeed, some in the psychiatric community are of the view that clinical predictions as to whether a person would or would not commit violent acts in the future are 'fundamentally of very low reliability' and that psychiatrists possess no special qualifications for making such forecasts." 451 U.S. at 472.

---

**3.** It is important to note that one of the three questions the sentencing jury in Texas must answer affirmatively before imposing the death penalty is " 'whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.' " *Estelle v. Smith,* 451 U.S. 454, 458, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981).

Second, in *Jurek,* 428 U.S. 262, the Supreme Court rejected the petitioner's contention that it is impossible to predict future behavior:

"Focusing on the second statutory question that Texas requires a jury to answer in considering whether to impose a death sentence, the petitioner argues that it is impossible to predict future behavior and that the question is so vague as to be meaningless. It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities." 428 U.S. at 274-75 (footnote omitted).

Although this language must be viewed in the context of the Texas capital punishment statute, it negates Calhoun's contention that evidence concerning future dangerousness is so speculative and unreliable as to result in a denial of due process.

Accordingly, we reject this contention.

### F

Calhoun contends, "Article 27, sec. 413 (d) (10), which permits imposition of the death penalty upon proof that the murder was committed during the commission or attempt to commit a specified felony, is an unconstitutional aggravating factor."

Calhoun makes two points relative to this issue, (1) that § 413 (d) (10) produces an overbroad aggravating circumstance and results in a mandatory application of the death penalty, and (2) that the death penalty for felony murder is excessive in that the punishment is disproportionate to the crime committed and there is no deterrent or retributive value in the punishment for felony murder.

The State in response points out that the aggravating factor is limited in application by its own terms to murder in the commission of "robbery, arson, or rape or sexual offense in the first degree" while the felony murder statute, Article 27, § 410, pertains to "any rape in any degree, sexual offense in the first or second degree, sodomy, mayhem, robbery, burglary, kidnapping as defined in §§ 337 and 338 of [Article 27], storehouse breaking as defined in §§ 32 and 33 of [Article 27] or daytime housebreaking as defined in § 30 (b) of [Article 27], or in the escape or attempt to escape from [certain penal institutions]." Section 413 (d) (10) is also limited by other provisions. Art. 27, § 413 (e) (1) requires that the defendant be a principal in the first degree, thus exempting any accomplices to the felony who did not actually commit the murder. The aggravating circumstances are further limited by the mitigating circumstances of each case that are weighed against these aggravating circumstances during the sentencing proceedings. Thus, read as a whole the statute meets the *Gregg* standards and imposes the death penalty only in an "extreme" case. *Gregg,* 428 U.S. at 182.

The Supreme Court has considered cases challenging the scope of aggravating circumstances in death penalty cases. In *Godfrey v. Georgia,* 446 U.S. 420, the plurality opinion was written by Justice Stewart. The opinion referred to *Gregg,* 428 U.S. 153, and *Furman,* 408 U.S. 238. It states, "A capital sentencing scheme must, in short, provide a ' "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." ' " 446 U.S. at 427.

In *Godfrey* the petitioner was found guilty of the murder of his wife and mother-in-law. The only aggravating circumstance which applied to the facts stated, "The offense of murder . . . was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Ga. Code Ann. § 17-10-30 (b) (7) (1982). In *Gregg* the Court had considered the same provision and found it constitutional based on the limiting interpretation of the provision by the Supreme Court of Georgia. In *Godfrey* the Supreme Court found Georgia went too far in applying the provision and as a result the aggravating circumstance was unconstitutional.

> "In the case before us, the Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was 'outrageously or wantonly vile, horrible and inhuman.' There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman.'" 446 U.S. at 428-29 (footnote omitted).

In a footnote, however, Justice Stewart recognized for the plurality that the other Georgia aggravating factors were "more specific or objectively measurable than § (b) (7) . . . ." 446 U.S. at 423 n. 2. One of the nine circumstances listed is similar to the aggravating factor at issue in the present case. Ga. Code Ann. § 17-10-30 (b) (2) (1982), states as an aggravating factor, "The offense of murder . . . was committed while the offender was engaged in the commission of another capital felony, [(rape, armed robbery, kidnapping)] or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree." Under the Maryland statute felony murder as an aggravating circumstance is sufficiently limited by its own terms and other provisions of the statute, thus meeting the constitutional

requirements set down by the Supreme Court in *Godfrey.* In this instance the jury found two other aggravating circumstances. However, even if this particular aggravating circumstance had been the only one found it would not result in an "arbitrary and capricious" infliction of the death sentence, as prohibited by the Supreme Court in *Furman,* 408 U.S. 238. *See also Gregg v. Georgia,* 428 U.S. at 188.

Although § 413 (d) (10) is the most common aggravating circumstance applied, this does not detract from its validity when the data relative to capital cases is placed in perspective. While the majority of capital cases where the death penalty was imposed by the sentencing authority contained (d) (10) as at least one of the aggravating circumstances (75%), there is no evidence that the majority of all murders in the State are felony murders of the type listed in § 413 (d) (10). Additionally, not all of those charged with felony murder are principals in the first degree as required under § 413 (e) (1). There appear to be sufficient limits on the application of § 413 (d) (10) to meet the criteria of the Supreme Court. Absent other evidence to the contrary, Calhoun's claim of overbreadth is unfounded.

As to Calhoun's second claim that the death penalty is excessive in felony murder cases, guidelines have been established by the Supreme Court for consideration of this issue. In *Coker,* 433 U.S. 584, the Court considered several factors in deciding whether the death penalty was an excessive punishment for the crime of rape:

> "Under *Gregg,* a punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground." 433 U.S. at 592.

Primarily, the Court considered objective factors in reaching its decision, legislative judgments, and sentencing decisions

made by juries. It stressed the importance of society's view of what constitutes "cruel and unusual" punishment. That the death penalty was not a disproportionate punishment for the crime of murder was recognized by Justice White in the plurality opinion, in which he compared the crime of murder to the crime of rape:

"Rape is without doubt deserving of serious punishment; but in terms of moral depravity and of the injury to the person and to the public, it does not compare with murder, which does involve the unjustified taking of human life. Although it may be accompanied by another crime, rape by definition does not include the death of or even the serious injury to another person. The murderer kills; the rapist, if no more than that, does not. Life is over for the victim of the murderer; for the rape victim, life may not be nearly so happy as it was, but it is not over and normally is not beyond repair." 433 U.S. at 598 (footnote omitted).

More recently the Supreme Court considered whether the death penalty is valid punishment for an accomplice sentenced to death for felony murder where the accused "neither took life, attempted to take life, nor intended to take life." *Enmund v. Florida,* 458 U.S. 782, 787, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982). The Court found the punishment to be excessive in that case. Justice White noted for the Court that "one state flatly prohibits capital punishment in cases where the defendant did not actually commit murder," refering to our requirement that it is only a principal in the first degree who is subject to the death penalty. Although the holding of the Court is not explicit, it appears that the Court in *Enmund* was not declaring the death penalty excessive for an accomplice in felony murder but only as applied to the circumstances of that case. The Court said:

"Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the state treated them alike

.and attributed to Enmund the culpability of those who killed the Kerseys." 458 U.S. at 798.

In *Enmund* the Court considered legislative decisions as evidenced by death penalty statutes then operating as well as sentencing decisions made by juries and found little support for the death penalty in accomplice felony murder cases. In this regard it should be noted that, according to the statistics in the Supreme Court opinion, Maryland is the only state of approximately thirty-two states with death penalty statutes which flatly prohibits capital punishment where the defendant is not a principal in the first degree. The Court observed:

> "The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence,' *Lockett v. Ohio,* 438 U.S. 586, 605 (1978) (footnote omitted), which means that we must focus on 'relevant facets of the character and record of the individual offender.' *Woodson v. North Carolina,* 428 U.S. 280, 304 (1976)." 458 U.S. at 798 (emphasis in original).

Although under the facts in *Enmund* the Court denied the death penalty's value as a punishment, it did not deny the deterrent and retributive value under felony murder as applicable in Maryland:

> "We are quite unconvinced, however, that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken. Instead, it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation.'

*Fisher v. United States,* 328 U.S. 463, 484 (1946) (Frankfurter, J., dissenting), for if a person does not intend that life be taken or contemplate that lethal force will be employed by others, the possibility that the death penalty will be imposed for vicarious felony murder will not 'enter into the cold calculus that precedes the decision to act.' *Gregg v. Georgia, supra,* at 186." 458 U.S. at 798-99.

In *Enmund,* on the subject of retribution, the Court further said:

"As for retribution as a justification for executing Enmund, we think this very much depends on the degree of Enmund's culpability — what Enmund's intentions, expectations, and actions were. American criminal law has long considered a defendant's intention — and therefore his moral guilt — to be critical to 'the degree of [his] criminal culpability,' *Mullaney v. Wilbur,* 421 U.S. 684, 698 (1975), and the Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing." 458 U.S. at 800.

Although Calhoun has argued his lack of intent to commit murder in the course of a felony, the operation here was planned. This was set forth in the testimony of the accomplice relative to the postmidnight meeting after they were initially scared off. The felons wore masks and gloves. Calhoun and his associate went armed. The guns must have been intended for use if circumstances required. Those instructing in the use of firearms teach that one should not point a gun at an individual unless one intends to kill that individual. Although the Supreme Court in *Enmund* found no value in the punishment for one who was neither present or armed at the time of murder, it did not deny the value of the penalty as a punishment imposed on the "trigger man." We find § 413 (d) (10) to be a constitutional aggravating factor.

## G

Calhoun claims, "Article 27, sec. 413 (c), renders the death penalty in Maryland unconstitutional." This contention apparently is based on the belief that the section is constitutionally infirm because of its broad provisions as to evidence the sentencing authority is to consider in reaching its decision to impose either the death penalty or life imprisonment. Section 413 (c) (1) states in its entirety:

"(c) *Evidence; argument; instructions.* — (1) The following type of evidence is admissible in this proceeding:

"(i) Evidence relating to any mitigating circumstance listed in subsection (g);

"(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of which the State had notified the defendant pursuant to § 412(b);

"(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures;

"(iv) Any presentence investigation report. However, any recommendation as to sentence contained in the report is not admissible; and

"(v) Any other evidence that the court deems of probative value and relevant to sentence, provided the defendant is accorded a fair opportunity to rebut any statements."

Calhoun contends that the statute fails to satisfy the constitutional mandate to limit jury discretion: it fails not only to provide clear and objective standards that provide specific guidance for the sentencing authority, but also to provide a basis for the rational review of the sentence. The fact that the jury is given the same boundless discretion in capital punishment cases — to consider reliable, nonjudicial evidence of conduct — as the trial judge is given in other

criminal cases violates the Eighth and Fourteenth Amendments.

The State contends that the guidance constitutionally required to be given to the jury is manifested in the Maryland statute. Thus, the jury may consider some evidence not properly admissible at the trial stage when determining the sentence to be imposed. It notes that the admissibility of evidence relating to a defendant's conduct cannot result in the creation of new, nonstatutory aggravating circumstances because such evidence is admissible only *after* statutory aggravating circumstances have been proven.

In *Johnson v. State*, 292 Md. 405, Judge Digges said for the Court:

> "In our view, part (v) [of § 413(c)] in unambiguous terms authorizes the trial court to admit into evidence before the sentencing jury identical information concerning a defendant's criminal conduct as would normally be considered by the judge if he were imposing sentence in a non-death penalty case." 292 Md. at 442-43.

We further noted that the sentencing authority in a capital punishment case ought to be provided all relevant information. *Id.* at 443. Calhoun contends that this grant of discretion to the jury is too broad and thus violates his Eighth and Fourteenth Amendment rights. He overlooks, however, both the context of the Maryland statute in which this discretion is to be exercised and various Supreme Court opinions that approve jury sentencing in death penalty cases.

The Supreme Court has stated several times that the jury's authority to sentence a person convicted of first degree murder to death is constitutional as long as procedural safeguards exist that "guide" and "channel" the jury's decision. *See Barclay,* U.S. , 103 S. Ct. 3418, 3424; *Zant,* U.S. , 103 S. Ct. 2733, 2742-43; *Proffitt,* 428 U.S. 242, 258; *Jurek,* 428 U.S. 262, 276; *Gregg,* 428 U.S. 153, 192; and *Furman,* 408 U.S. 238, 400-01 (Burger, C.J., dissenting).

In *Furman* Chief Justice Burger noted that the penalty of death itself was not cruel; rather, the procedures for imposing sentence violated the Eighth Amendment. 408 U.S. 238, 397-98 (Burger, C.J., dissenting). The Chief Justice stated that legislatures must provide sentencing standards and narrow definitions of crimes for which the death penalty may be imposed in order to insure its imposition in a rational, noncapricious, and nonarbitrary manner. *Id.* at 400-01. This view was noted by the plurality opinion in *Gregg*, 428 U.S. 153, "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189. The *Gregg* plurality recognized the problem that juries, as inexperienced sentencers, could misapply information heard in a sentencing proceeding:

> "[T]he provision of relevant information under fair procedural rules is not alone sufficient to guarantee that the information will be properly used in the imposition of punishment, especially if sentencing is performed by a jury. Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given. . . . To the extent that this problem is inherent in jury sentencing, it may not be totally correctible. It seems clear, however, that the problem will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." 428 U.S. at 192 (citations omitted).

The plurality then noted that the Georgia statute provided the sentencing authority sufficient guidelines by means of its listing the aggravating and mitigating factors to be considered combined with its requiring the jury to specify the factors it used in reaching its decision. *Id.* at 197-98. The

Court there stated that the combination of a carefully drafted statute and a bifurcated proceeding at which the sentencing authority was "apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information" insures rational imposition of the death penalty. *Id.* at 195. The plurality opinion further noted, "So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision." *Id.* at 203-04, cited with approval in *Zant,* U.S. at , 103 S. Ct. at 2748.

Concerning the statute at issue in *Proffitt,* 428 U.S. 242, the plurality opinion noted that the jury was provided with sufficient guidance at the sentencing phase so as to ensure that capital punishment is imposed rationally and nonarbitrarily:

> "While the various factors to be considered by the sentencing authorities do not have numerical weights assigned to them, the requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.
>
> "The directions given to judge and jury by the Florida statute are sufficiently clear and precise to enable the various aggravating circumstances to be weighed against the mitigating ones. As a result, the trial court's sentencing discretion is guided and channeled by a system that focuses on the circumstances of each individual homicide and individual defendant in deciding whether the death penalty is to be imposed." 428 U.S. at 258.

Moreover, in *Barclay,* U.S. , 103 S. Ct. 3418, the plurality opinion stated that a sentencing authority's

bringing of its own experience to bear on a sentencing determination did not constitute an abuse of discretion and thus did not violate the petitioner's rights under the Eighth and Fourteenth Amendments. In rejecting Barclay's argument that the trial judge improperly compared Barclay's actions to those of the Nazis in World War II, Justice Rehnquist said for the plurality:

> "Any sentencing decision calls for the exercise of judgment. It is neither possible nor desirable for a person to whom the state entrusts an important judgment to decide in a vacuum, as if he had no experiences. The thrust of our decisions on capital punishment has been 'that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' *Zant v. Stephens,*  U.S.  ,  , 103 S. Ct. 2733, 2741, 75 L. Ed. 2d  (1983), quoting *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S. Ct. 2909, 2932, 49 L. Ed. 2d 859 (1976) (opinion of Stewart, POWELL, and STEVENS, JJ.). . . .

> "It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing. We expect that sentencers will exercise their discretion in their own way and to the best of their ability. As long as that discretion is guided in a constitutionally adequate way, see *Proffitt v. Florida,* 428 U.S. 242, 96 S. Ct. 2960, 49 L. Ed. 2d 913 (1976), and as long as the decision is not so wholly arbitrary as to offend the Constitution, the Eighth Amendment cannot and should not demand more."  U.S. at  , 103 S. Ct. at 3424.

*Accord id.*  U.S. at  , 103 S. Ct. at 3435 (Stevens, J., concurring, joined by Powell, J.).

The above cited Supreme Court cases state that a sentencing jury's exercise of discretion is permissible as long as that exercise is conducted within the confines and in com-

pliance with the standards of a "carefully drafted" capital sentencing statute. Maryland's statute, as previously analyzed in *Johnson,* 292 Md. 405, and *Tichnell I,* 287 Md. 695, falls within the Supreme Court's prescription for a statute that provides sufficient guidance and opportunity for channeled discretion to the sentencing authority. First, the sentencing authority must determine whether any enumerated statutory aggravating circumstance exists beyond a reasonable doubt. Art. 27, § 413 (d). Second, if the sentencing authority finds that one or more aggravating circumstances exist, it must consider whether any mitigating circumstances exist by a preponderance of the evidence; as illustrated in this case, the sentencing authority is not restricted to a consideration of the specifically enumerated statutory mitigating factors. Section 413 (g). Third, the sentencing authority must determine whether the mitigating circumstances outweigh the aggravating circumstances by a preponderance of the evidence; only if the mitigating circumstances do not outweigh the aggravating circumstances under the preponderance standard is the death sentence imposed. Section 413 (h). Fourth, the determination of the sentencing authority must be in writing and must be unanimous. Section 413 (i). Fifth, the sentencing authority must specify in writing the factors considered in rendering its decision. Section 413 (j). All of these provisions together provide the guidance and means of channeling the jury's discretion that the Supreme Court requires. Hence, we reject this contention of Calhoun.

## H

Calhoun next contends that "Article 27, secs. 413 and 414, unconstitutionally restrict the discretion of the finder of fact in determining whether the death penalty should be imposed."

Calhoun first contends that the Maryland death penalty statute is unconstitutional because it mandates the sentence of death in any case where one or more aggravating circumstances are found but no mitigating circumstance is found.

We hasten to point out that a mitigating circumstance was found in this instance. Thus, that portion of his contention is not before us. He claims the sentencing authority should be entitled to conclude that even if a case is within the literal terms of one or more statutory aggravating circumstances, the death penalty is unwarranted. He further contends that the capital punishment statute is unconstitutional because different factfinders may perceive particular aggravating and mitigating circumstances differently; thus, the determination of whether the death penalty should be imposed rests on "semantic distinctions."

The State argues that the Maryland statute is constitutional because it permits a sentencing authority to articulate any mitigating factor — statutory or nonstatutory — deemed relevant and then to consider whether it outweighs the statutory aggravating factor or factors. Therefore, the statute does not mandate the imposition of the death penalty in any given type of case.

In *Tichnell I,* 287 Md. 695, we noted that because the Maryland statute allows for consideration of a broad range of mitigating factors, it satisfied the standards established by the Supreme Court in *Woodson,* 428 U.S. 280, and *Roberts (Stanislaus) v. Louisiana,* 428 U.S. 325. *See Tichnell I,* 287 Md. at 728. In *Woodson* and *Roberts (Stanislaus),* as well as in *Roberts (Harry) v. Louisiana,* 431 U.S. 633, 97 S. Ct. 1993, 52 L. Ed. 2d 637 (1977), the Supreme Court struck down statutes that required the mandatory imposition of the death penalty for first degree murder. The Court's primary criticism of the North Carolina and Louisiana statutes was that they precluded consideration of the particular traits of the individual defendant and the particular circumstances of the crime for which he was convicted. *See Roberts (Harry),* 431 U.S. at 637; *Roberts (Stanislaus),* 428 U.S. at 335-36; *Woodson,* 428 U.S. at 304-05.

Our statute provides for an individualized determination of the defendant and the crime. This fact alone would appear to insure that the death sentence is not imposed in a mandatory manner. Further, as Chief Judge Murphy noted for the Court in *Tichnell III,* 297 Md. 432, in the forty-eight cases

where the State sought the death penalty it was imposed twenty times, thus negating any mandatory result. Moreover, the sentencing authority may articulate *any factor* it finds in mitigation. *See* Code (1957, 1982 Repl. Vol.) Art. 27, § 413 (g) (8), which states, "Any other facts which the jury or the court specifically sets forth in writing that it finds as mitigating circumstances in the case." Indeed, this case is a splendid example of the willingness of a jury to consider relevant information that may be weighed against a proven statutory aggravating circumstance or circumstances. Here the jury determined that "a substantial mitigating factor is the defendant's background, which has been such that he has never been integrated into society. Therefore, he has been and is unable to conform with its norms and moral values."

Finally, of the forty-eight cases in which the State sought the death penalty, only one involved the situation about which Calhoun here warns: where one or more aggravating circumstances is found and no mitigating circumstance is established.

This contention of Calhoun also must fall.

I

Calhoun claims, "The statute unconstitutionally places the burden of proof to show mitigation on the accused."

Calhoun argues that the statute violates his due process rights by placing an unconstitutional burden on him to prove by a preponderance of the evidence the mitigating circumstances and that they outweigh any aggravating factor. He contends that the burden of proof must be on the State to prove beyond a reasonable doubt the absence of any mitigating circumstance raised and that the aggravating circumstances outweigh the mitigating circumstances. He asserts that the sentencing proceeding is as important as the trial, particularly when the punishment is death, and, therefore, due process protections require that the risk of error be minimized by placing the burden on the State.

Judge Digges said for the Court in *Johnson,* 292 Md. at 436, that this argument was "thoroughly considered and rejected, however, in our recent decision of *Tichnell v. State,* 287 Md. 695, 720-34, 415 A.2d 830, 843-50 (1980), and we deem the matter to be settled." We need say no more.

x Sufficiency of the evidence

Calhoun contends that Maryland Code (1957, 1982 Repl. Vol.) Art. 27, § 413 (e) (1) provides that one may not be punished by death absent proof that he was a principal in the first degree to first degree murder. He also says, correctly, that under *State v. Ward,* 284 Md. 189, 197, 396 A.2d 1041 (1978), a first degree principal is one who actually commits a crime. Then he cites *Bedford v. State,* 293 Md. 172, 443 A.2d 78 (1982), and asserts that "in order to justify the sentence of death, the State was bound to adduce evidence sufficient to permit a rational trier of facts to find beyond a reasonable doubt that [Calhoun] fired the shots which killed Officer Metz." We pointed out in *Bedford:*

> "Applying [the] standard under *Jackson [v. Virginia],* 443 U.S. 307, [99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)], Chief Judge Murphy said for the Court in *State v. Rusk,* 289 Md. 230, 240, 424 A.2d 720 (1981), 'The applicable standard is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original). *Accord, Tichnell v. State,* 287 Md. 695, 717, 415 A.2d 830 (1980)." 293 Md. at 175-76 (footnote omitted).[4]

---

4. We pointed out in *Bedford* for the benefit of the generation of attorneys admitted to the bar in the last thirty years that it was long customary for counsel to read to the jury from various textbooks. A favorite of defense counsel was L. Hochheimer, *Criminal Law* (2d ed. 1904). Their favorite text was § 157 of that work relative to the burden of proof which we said we regarded "as being basically in accord with that enunciated by the Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)." 293 Md. at 176 n. 1.

On the burden of proof *see also Veney v. State,* 251 Md. 182, 201, 246 A.2d 568 (1968), *cert. denied,* 394 U.S. 948 (1969), a capital case, where we referred to *Pressley v. State,* 244 Md. 664, 667, 224 A.2d 866 (1966), as to the sufficiency of evidence, and *Ramsey v. State,* 239 Md. 561, 566-67, 212 A.2d 319 (1965), as to our function as an appellate court as to sufficiency of the evidence.

We have already recited the evidence. Cummins described how Metz was pulled into the doorway. When less than a minute later Cummins was dragged into the office he observed Metz lying on the floor and bleeding from the head. Calhoun was alone in the room with Cummins and Metz' body at that time. Calhoun's contention relative to insufficiency is the existence of a door in the office that led to the outside. He claims that a third person might have fired the shots and then escaped from the room in question by that door. Yet Calhoun and the man who shot Cummins saw fit to escape through the roof. A rational trier of fact certainly could find that Calhoun was the only one present who could have killed Metz and that, if the robbers were aware of a quick method of escape through the door, Calhoun and his cohort would not have seen fit to go through a hole in the roof.

We hold that there was sufficient evidence to conclude that Calhoun was a principal in the first degree.

## xi Proportionality review

Calhoun is now thirty years of age, being a few days short of twenty-eight years of age at the time of the incident in question. The jury found as aggravating factors: (1) the victim was a law enforcement officer who was murdered in the performance of his duties; (2) the defendant committed the murder in furtherance of an escape from or an attempt to escape from or evade the lawful custody, arrest or detention of or by an officer or guard of a correctional institution or by a law enforcement officer, and (3) the defendant committed the murder while committing or attempting to commit robbery. The only mitigating circumstance was set

forth under "8," other mitigating circumstances. The jury stated:

> "This jury feels that a substantial mitigating factor is the defendant's background, which has been such that he has never been integrated into society. Therefore, he has been and is unable to conform with its norms and moral values."

The jury's sentence was death. Prior to this incident Calhoun had been convicted of armed robbery four times, in 1971, 1972, 1978, and 1979. His first conviction was when he was eighteen years of age.

In *Tichnell III*, 297 Md. 432, we have already set forth the "relevant universe" to be considered by us in our proportionality review. In the process of our review in this case we have considered each of the reports submitted by trial judges under Rule 772A.[5] We have selected six which we deem to be "similar" within the contemplation of Code (1957, 1982 Repl. Vol.) Art. 27, § 414 (e) (4):

> 1 — *Harlow Brian Sails:* Sails robbed a jewelry store in a shopping mall. Upon entering the store Sails and his cohorts placed masks over their faces and pulled out handguns. Sails was armed with a 9 mm. semi-automatic pistol. He and one of his associates were wearing bullet-proof vests. He and his co-defendants were apprehended by an off-duty policeman as they were leaving the mall. The officer and one co-defendant exchanged shots. Sails fired several shots at the officer. After the officer was wounded and on the floor, Sails went closer to him and fired two or more shots into him. Following this incident, as Sails was leaving the mall, a man accosted and tripped Sails, who then shot the man, inflicting wounds in both of the man's legs.
>
> Sails was convicted of first degree murder, two counts of robbery with a deadly weapon, and three counts of use

---

5. The appellant relied upon no additional cases in his brief.

of a handgun. Three aggravating circumstances were found by the jury: (1) the victim was a law enforcement officer who was murdered while in the performance of his duties; (2) the defendant committed the murder in furtherance of an escape from or an attempt to escape from or evade lawful custody, arrest or detention of or by an officer or guard of a correctional institution or by a law enforcement officer; and (3) the defendant committed the murder while committing or attempting to commit robbery, arson or rape or sexual offense in the first degree. Mitigating circumstances found by the jury were: (1) the defendant had not previously been found guilty of a crime of violence, etc.; (2) the murder was committed while the capacity of the defendant to conform his conduct to the requirements of law were substantially impaired as the result of mental incapacity, mental disorder, emotional disturbance or intoxication; (3) it was unlikely that the defendant would engage in further criminal conduct that would constitute a continuing threat to society; and (4) under "8" or other mitigating circumstances:

"A. Harlow Brian Sails had not been incarcerated prior to his arrest following the events at Iverson Mall on 2/8/82.

"B. The defendant's criminal activity has not been characterized by gratuitous and sadistic physical violence against persons.

"C. The defendant is not a sadistic executioner style killer.

"D. The defendant's background and upbringing, which was unstable, marked by emotional trauma, neglect and inattention, and which lacked adequate guidance and supervision contributed to his criminal conduct."

The jury determined that the mitigating circumstances outweighed the aggravating circumstances and returned a sentence of life imprisonment.

2 — *Jackie Hughes:* While a manager of a restaurant was walking to a nearby bank to deposit weekend receipts Hughes approached him from behind, grabbed him, spun him around, and shot him in the stomach. After a brief struggle Hughes wrested away the deposit. The victim, who was licensed to carry a handgun, fired several shots at Hughes at close range. A jury found Hughes guilty of first degree murder on the basis of the fact that it was a deliberate, willful and premeditated murder as well as a felony murder.

The jury found as an aggravating factor that the murder was committed while committing or attempting to commit a robbery. As a mitigating factor it found that Hughes had not previously been convicted of a crime of violence, etc. It also checked item "8," that other mitigating circumstances existed, but listed none. The jury returned a sentence of life imprisonment.

3 — *Richard Danny Tichnell:* The facts of this case have been detailed in *Tichnell I,* 287 Md. 695, and *Tichnell III,* 297 Md. 432. The victim, a police officer, was shot several times when he responded to a burglar alarm at a store in Garrett County. The facts at trial indicated that the victim was shot from behind, giving rise to an inference that Tichnell had ambushed the victim when the officer had apprehended Tichnell's co-defendant. The jury found two aggravating circumstances: (1) that the victim was a law enforcement officer who was murdered while in the performance of his duties, and (2) that Tichnell committed the murder in furtherance of an escape from or an attempt to escape from or evade the lawful custody, arrest or detention of or by an officer or guard of a correctional institution or by a law enforcement officer. The only mitigating circumstance found by the jury was that Tichnell had not previously been convicted of a crime of violence. The death sentence was imposed.

4 — *Brian Keith Quickley:* Quickley and two others entered a furniture store in Harford County. An accom-

plice lured the victim to an area of the store isolated from the cash register. Quickley there shot the victim once between the eyes and again, as he was falling, in the back of the neck. The three individuals then left the store, taking television sets with them.

The jury found one aggravating circumstance, that the defendant committed the murder while committing or attempting to commit robbery. It found two mitigating circumstances. The first was the youthful age of the defendant at the time of the crime. The second, under "8" or "[o]ther mitigating circumstances," was:

> "The defendant is at the borderline range of intelligence with severe intellectual limitations both at the verbal and performance measured levels. His overall Intelligence Quotient was scored at 71. He is the product of an impoverished, social and educational environment. His academic progress has been limited. He has been in and out of Special Education and last attended the ninth grade. Extensive materials (tests, reports, etc.) from Juvenile Services, Harford County Public School System, the Maryland Children's Center and various social service groups have been filed in these proceedings as exhibits that demonstrate these inabilities."

The jury sentenced him to life imprisonment.

5 — *Eugene Sherman Colvin,* now pending before this Court: Colvin broke into a house. In the course of the crime he encountered the victim who was visiting in the home of her daughter. The victim was stabbed twenty-eight times about the throat. The weapon used was an eight-inch serrated knife taken from the kitchen of the home. About $10,000 in jewelry was removed from the residence. The victim's money was taken. Colvin was found guilty of premeditated murder, felony murder, robbery with a deadly weapon, and housebreaking.

As an aggravating circumstance the jury found that the murder was committed while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree. No mitigating circumstances were found. Colvin's prior criminal record is similar to that of Calhoun in that he had been convicted several times of burglary, assault, and larceny. The jury imposed the death sentence.

6 — *Curtis Wayne Monroe:* Calhoun's cohort in the case at bar. The report of the trial judge, relative to the facts, states:

> "The police officer was pulled into a room, subdued, and shot in the head by Calhoun. At the same time, Monroe began firing a handgun, wounding the assistant manager, Douglas Cummins, and firing two shots into the alarm technician, David Myers, resulting in the death of Mr. Myers."

Monroe waived a jury and elected to have the sentencing procedure before the trial judge. As an aggravating circumstance it was found beyond a reasonable doubt that Monroe "committed the murder while committing or attempting to commit robbery, arson or rape or sexual offense in the first degree." The trial judge noted two mitigating circumstances. First, he found that it was unlikely the defendant would engage in further criminal activity that would constitute a continuing threat to society. Second, under "[o]ther mitigating circumstances," he found:

> "Defendant has been employed, has a wife and two children.
>
> "The actions of the defendant causing the murder, along with his background when compared to the other first degree murder cases occurring since the enactment of Article 27, Section 413, in which the death penalty has not been imposed.
>
> "Effort by the defendant since his incarceration to further his education."

Life imprisonment was imposed. In his report to us the trial judge said:

> "The primary consideration in not imposing the death penalty was the Court's own proportionality test in comparison to other offenses in the Circuit Court for Montgomery County in which the death penalty had been sought but not imposed, and a comparison between Curtis Wayne Monroe and the co-defendant James Arthur Calhoun, who received the death penalty, indicated that the imposition of the death penalty was not appropriate in this case. Other mitigating circumstances did not outweigh the aggravating factor and the nature of the offense."

Pursuant to the mandate of Code (1957, 1982 Cum. Supp.) Art. 27, § 414 (e) as to factors to be considered by us relative to the sentence, we find in this case that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; the evidence supports the jury's finding of a statutory aggravating circumstance under § 413 (d); the evidence supports the jury's finding that the aggravating circumstances are not outweighed by mitigating circumstances; and the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. We point out that in three of the cases we have reviewed in which the defendant was sentenced to life imprisonment — Sails, Hughes, and Quickley — the sentencing jury found several mitigating factors; in Monroe, the sentencing judge found two mitigating factors. In this case Calhoun's environment was the sole mitigating circumstance. In none of the reviewed cases where the death penalty was imposed did the sentencing authority find that three aggravating circumstances were proven beyond a reasonable doubt as in this case. It thus follows that the death sentence must be affirmed.

*JUDGMENT AFFIRMED.*

*Davidson, J., dissenting:*

I adhere to my view that under Maryland Code (1957, 1982 Repl. Vol.), Art. 27, § 414 (e) the inventory of cases utilized for proportionality review must include not only those death-eligible cases in which the prosecutor has sought the death penalty, whether it was imposed or not, but all those death-eligible cases in which the prosecutor did not seek the death penalty. *Tichnell v. State,* 297 Md. 432, 485, 468 A.2d 1, 26 (1983) (Davidson J., dissenting) *(Tichnell III).* For the reasons expressed in Part I of my dissenting opinion in *Tichnell III,* I would vacate the death sentence in this case. Accordingly, I respectfully dissent.

In addition, however, I feel impelled to note that the majority's decision is indefensible for other reasons as well — for today the majority permits a defendant, deprived of a fair and impartial sentencing proceeding, to be executed because his lawyer allegedly made a mistake. In my view, the admission of testimony concerning an incident that occurred at the Montgomery County Detention Center in August 1981 involving the defendant and a correctional officer constituted prejudicial error. For the additional reasons expressed below, I would vacate the death sentence in this case.

The majority here refuses to consider whether the trial court committed prejudicial error when, during the sentencing proceeding, it admitted into evidence testimony concerning the Montgomery County Detention Center incident in August 1981. The majority finds that the defendant's specific objection to this testimony was that it "bore no relationship to the specified aggravating circumstances." Additionally, the majority finds that the specific objection "was narrowed by defense counsel to whether the incident at the detention center was relevant to 'a mitigating circumstance.'" Relying upon *von Lusch v. State,* 279 Md. 255, 368 A.2d 468 (1973), the majority determines that the

defendant waived his right to object to the admission of the evidence on the ground that it was inadmissible under Maryland Code (1957, 1982 Repl.Vol., 1983 Cum.Supp.), Art. 27, § 413 (c) (1) (iii). I do not agree.

The defendant's specific objections, as recognized by the majority, were that the testimony concerning the Montgomery County Detention Center incident was not relevant to either an aggravating or mitigating circumstance. In essence, the defendant's specific objections were that the testimony was inadmissible under Maryland Code (1957, 1982 Repl.Vol., 1983 Cum.Supp.), Art. 27, § 413 (c) (1) (i) and (ii). More particularly, with respect to mitigating circumstances, the defendant's specific objection was that this testimony was not relevant to the mitigating circumstance delineated in Maryland Code (1957, 1982 Repl.Vol., 1983 Cum.Supp.), Art. 27, § 413 (g) (7) — that the defendant was unlikely to engage in further criminal activity.

I do not, however, agree with the majority that by specifying § 413 (c) (1) (i) and (g) (7) the defendant waived an objection on the ground that the objected to testimony was inadmissible under § 413 (c) (1) (iii) and, therefore, failed to preserve that question for review. In my view, § 413 (c) (1) (i), (g) (7), and (c) (iii) are integrally related.[1] Both § 413 (c) (1) (i) and (c) (1) (iii) are component parts of § 413 (c) (1) that must be read in conjunction with one another. *Scott v. State,* 297 Md. 235, 248, 465 A.2d 1126, 1133 (1983). Testimony inadmissible under § 413 (c) (1) (iii) is inadmissible under § 413 (c) (1) (i) to disprove the existence of the mitigating circumstance delineated in § 413 (g) (7). Indeed, this Court has held that § 413 (c) (1) (i) and (iii) preclude "in a death penalty case, the admission of evidence of crimes of violence for which there have been no convictions. . . ." *Scott,* 297 Md. at 247, 465 A.2d at 1133. In sum, § 413 (c) (1) (iii) is subsumed in § 413 (c) (1) (i).

---

1. § 413 (c) (1) provides in pertinent part:

"The following type of evidence is admissible in this proceeding:

In the instant case, the defendant was not required to and did not in fact specify the reasons underlying his objection and supporting his contention that under § 413 (c) (1) (i) the objected to testimony was irrelevant to the mitigating circumstance delineated in § 413 (g) (7). Under these circumstances, the question before the trial court was whether the objected to testimony was inadmissible because under § 413 (c) (1) (i) it was irrelevant to the mitigating circumstance delineated in § 413 (g) (7). In order to resolve that question, the trial court was required to consider all of the reasons for which the objected to testimony might be irrelevant to the mitigating circumstance delineated in § 413 (g) (7).

Section 413 (c) (1) (i) and (iii) collectively establish that only evidence of unrelated crimes for which there has been a conviction is admissible and that evidence of unrelated crimes for which there has been a conviction is inadmissible to prove or disprove the existence of any mitigating circumstance, including the mitigating circumstance delineated in § 413 (g) (7). *Scott,* 297 Md. at 235, 465 A.2d at 1133. Accordingly, one of the reasons the trial court was required to consider in determining whether the objected to testimony was irrelevant to the mitigating circumstance delineated in § 413 (g) (7) was that it was unrelated to a crime for which there had been a conviction. The trial court determined that the objected to testimony was admissible under § 413 (c) (1) (iii) and, therefore, was admissible under § 413 (c) (1) (i) to disprove the existence of any mitigating circumstance, including the mitigating circumstance delineated in § 413 (g) (7). Thus, in light of the integral relationship be-

---

"(i) Evidence relating to any mitigating circumstance listed in subsection (g);

. . .

"(iii) Evidence of any prior criminal convictions, pleas of guilty or nolo contendere, or the absence of such prior convictions or pleas, to the same extent admissible in other sentencing procedures. . . ."

§ 413 (g) (7) establishes as a mitigation circumstance that:

"It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society."

tween § 413 (c) (1) (i), (g) (7), and (c) (1) (iii), the trial court determined the question whether the objected to testimony was irrelevant to the mitigating circumstance delineated in § 413 (g) (7) and, therefore, inadmissible under § 413 (c) (1) (i) because it was inadmissible under § 413 (c) (1) (iii). There was nothing further that the defendant was required to do in order to preserve that question for appellate review. Md. Rule 522 a.[2] In short, the question presented to this Court was raised in and decided by the trial court and, therefore, was properly preserved for review.

Even if I agreed with the majority that the question whether the objected to testimony was inadmissible under § 413 (c) (1) (iii) was not properly preserved for review, I would, nonetheless, consider and determine that question. In *von Lusch,* 279 Md. at 262-64, 368 A.2d at 472, relied upon by the majority, this Court established a principle of waiver premised upon Maryland Rules 522 d and 725 f.[3] There, this Court said:

> "[W]here one objecting to the admission of evidence, although not requested by the court to state his grounds, goes ahead and delineates the specific grounds for his objection, he will be bound by those grounds and will *ordinarily* be deemed to have waived other grounds not mentioned." *von Lusch,*

---

**2.** Md. Rule 522 a provides:

"A formal exception to a ruling or order of the court is unnecessary."

**3.** Md. Rule 522 d 1 provides:

"Unless requested by the court, it is not necessary to state the grounds for objections to evidence."

Md. Rule 725 f provided:

"Exceptions shall be governed by the provision of Rules 522 (Objections to Ruling or Order — Method of Making), 510 (Reservation of Points for Court *In Banc),* and 564 b 3 (Trial by Court — No Instructions, Objections or Exceptions)."

Md. Rule 761, effective 1 July 1978, supplanted Md. Rule 725 f without any change relevant here.

279 Md. at 263, 368 A.2d at 472-73 (emphasis added).

The use of the word "ordinarily" makes it plain that under certain circumstances this Court may determine whether evidence was improperly admitted for reasons other than those specified at trial. Manifestly, this Court has discretion in the application of this waiver principle. I would exercise that discretion in this death penalty case.

The statutory scheme embodied in §§ 413 and 414 evidences the General Assembly's recognition that the unique severity of the death penalty necessitates unprecedented modes of appellate review that require extraordinary scrutiny by this Court.[4] More particularly, § 414(a) provides:

"Whenever the death penalty is imposed, and the judgment becomes final, the Court of Appeals *shall* review the sentence on the record." (Emphasis added.)

This automatic direct appeal mandates that this Court review a death sentence even when unchallenged by the defendant. This legislative mandate suggests that unchallenged errors that occur at a death penalty sentencing proceeding should not be ignored. *See State v. Osborn,* 102 Idaho 405, 410-11, 631 P.2d 187, 192-93 (1981); *Commonwealth v. McKenna,* 476 Pa. 428, 439-44, 383 A.2d 174, 180-81 (1978). Indeed, the legislative mandate that the right to review a death sentence cannot be waived, supports the conclusion that the principles of waiver ordinarily applicable in criminal cases should not be rigidly applied by this Court in reviewing a death penalty sentencing proceeding.

---

4. § 414 (e) provides:

"In addition to the consideration of any errors properly before the Court on appeal, the Court of Appeals shall consider the imposition of the death sentence. With regard to the sentence, the Court shall determine:

This Court has consistently recognized that the principles of waiver ordinarily applicable in criminal cases should not be rigidly applied in death penalty cases. *Johnson v. State,* 292 Md. 405, 412 n.3., 439 A.2d 542, 547 n.3 (1982); *Bartholomey v. State,* 260 Md. 504, 513, 273 A.2d 164, 169 (1971). More particularly, in *Bartholomey,* 260 Md. at 513, 273 A.2d at 169, this Court said:

> "Questions 1, 3, and 5 do not appear to have been raised below and *ordinarily* we will not consider such questions on appeal pursuant to Maryland Rule 885. This, however, is a case involving the death penalty and we have decided to consider and determine all of the questions briefed and argued by the appellant before us whether or not tried and decided by the lower court." (Emphasis in original).

Similarly, in *Johnson,* 292 Md. at 412 n.3, 439 A.2d at 547 n.3, Judge Digges, writing for the majority, said:

> "[W]e shall assume without deciding that appellant's claim is properly preserved for review. We note, however, that, while 'ordinarily' we will not consider questions not properly preserved for appeal pursuant to Maryland Rule 885, in a previous death penalty case we demonstrated a less strict application of this principle and exercised our discretion to consider and determine questions briefed and argued before us whether or not properly preserved for review. See Bartholomey v. State, 260 Md. 504, 513, 273 A.2d 164, 169 (1971)."

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

"(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413 (d);

"(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances are not outweighed by mitigating circumstances; and

"(4) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Courts in other jurisdictions employing a variety of rationales have similarly concluded that the principles of waiver ordinarily applicable in criminal cases should not be applied in death penalty cases.[5] Illustrative is the case of *State v. Britt,* 235 S.C. 395, 424, 111 S.E.2d 669, 684 (1959), in which the Supreme Court of South Carolina said:

> "The power of the law to take the life of human beings for a violation of the law is one which should be and is exercised with extreme caution. The frailties of human nature are so manifold and manifest until the law should and does place around the defendant, whose life will be taken for a violation of the law, every safeguard to enable such defendant to secure a fair and impartial trial. This Court has taken the position that in all cases involving the life of the defendant, it is not bound down to a consideration of the exceptions raised, but if anything appears in the record which would warrant a reversal of the cause, this Court will consider that matter as if raised by the exceptions."

Moreover, in death penalty cases, this Court has repeatedly considered and determined questions briefed and

---

5. *E.g.,* Fisher v. United States, 328 U.S. 463, 467-68, 66 S.Ct. 1318, 1320-21 (1946); Stewart v. United States, 247 F.2d 42, 47 (D.C.Cir. 1957); Austin v. United States, 208 F.2d 420, 421 (5th Cir. 1953); Suhay v. United States, 95 F.2d 890, 893 (10th Cir.), *cert. denied,* 304 U.S. 580, 58 S.Ct. 1060 (1938); Butler v. State, 285 Ala. 387, 390, 232 So.2d 631, 632-33 (1970), *cert. dismissed,* 406 U.S. 939, 92 S.Ct. 1807 (1972); State v. Jeffers, 135 Ariz. 404, 432, 661 P.2d 1105, 1133 (1983); State v. Osborn, 102 Idaho 405, 410-11, 422-23, 631 P.2d 187, 192-93, 204-05 (1981); People v. Szabo, 94 Ill.2d 327, 354, 447 N.E.2d 193, 206 (1983); State v. Martin, 243 Iowa 1323, 1326-28, 55 N.W.2d 258, 260-61 (1952); State v. Spencer, 186 Kan. 298, 302, 349 P.2d 920, 923 (1960); Smith v. Commonwealth, 366 S.W.2d 902, 906 (1963); Commonwealth v. Harris, 371 Mass. 462, 470-71, 358 N.E.2d 982, 987-88 (1976); People v. Wood, 12 N.Y.2d 69, 78, 187 N.E.2d 116, 122, 236 N.Y.S.2d 44, 52 (1962); State v. Williams, 308 N.C. 47, 75-77, 301 S.E.2d 335, 353-54 (1983); Tuggle v. State, 73 Okla.Crim. 208, 211-12, 119 P.2d 857, 859 (1941); State v. Nodine, 198 Or. 679, 687, 259 P.2d 1056, 1059 (1953); Commonwealth v. McKenna, 476 Pa. 428, 437-41, 383 A.2d 174, 179-81 (1978); State v. Patterson, 278 S.C. 319, 320, 295 S.E.2d 264, 264-65 (1982); State v. Brown, 607 P.2d 261, 264-65 (Utah 1980); State v. Morris, 41 Wyo. 128, 146-47, 283 P. 406, 411 (1929). *But see* Hulsey v. State, 261 Ark. 449, 452, 549 S.W.2d 73, 75 (1977), *cert. denied,* 439 U.S. 882, 99 S.Ct. 220 (1978).

argued before us even when not properly preserved for appellate review. *Poole v. State,* 295 Md. 167, 185-86, 187-88, 453 A.2d 1218, 1228, 1229-30 (1983); *Johnson,* 292 Md. at 412 n.3, 439 A.2d at 547 n.3; *Tichnell v. State,* 287 Md. 695, 714-15, 415 A.2d 830, 840 (1980); *Bartholomey,* 260 Md. at 513, 273 A.2d at 169. Indeed, in *Calhoun,* the very case presently before us, the majority recognizes and applies this virtually universal principle. The majority twice expressly exercises its discretion to consider and determine questions that have not been properly preserved for appellate review. Thus, Judge Smith, writing for the majority, states:

"There is both a short and a long answer to Calhoun's contentions. The short answer is that counsel said, '[W]e are satisfied[,]' after the last juror was sworn subsequent to the exhaustion of Calhoun's peremptory challenges. The State then announced its satisfaction. *Thus, the point is waived. However, because of the nature of the case we shall give the 'long answer' to Calhoun's contentions."* (Citation omitted. Emphasis added.)

Similarly, Judge Smith subsequently states:

"As in iii, there is a short and a long answer to Calhoun's contention. The short answer is that no request for such instruction was made at trial nor was any objection made upon that basis to the instructions which were given as required by Rule 757 (f). Rule 757 (h) provides that an objection is not reviewable as of right unless it is made in compliance with Rule 757 (f). We are urged that we should take cognizance of this as 'plain error' within the meaning of Rule 757 (h). In *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980), we indicated that *an appellate court should take cognizance of unobjected to error only when the error is so 'compelling, extraordinary, exceptional or fundamental [as] to [deny] the defendant a fair*

*trial.' There is no such error in this case. Because this is a capital case in which we are affirming a sentence of death, however, we shall give the long answer to Calhoun's contention."* Emphasis added.)

Additionally, in death penalty cases, this Court has repeatedly considered and determined questions briefed and argued before it without any discussion or comment concerning allegations that those questions had not been properly preserved for appellate review. *Poole,* 295 Md. at 182, 453 A.2d at 1226-27 and Appellee's Brief at 6; *Johnson,* 292 Md. at 430-31, 439 A.2d at 557 and Appellee's Brief at 18-20; *Poole v. State,* 290 Md. 114, 125, 428 A.2d 434, 440 (1981) and Appellee's Brief at 25; *Tichnell,* 287 Md. at 714, 717-19, 415 A.2d at 840, 842-43, and Appellee's Brief at 23, 24. Indeed, in the instant case, the majority, in Section iv Approver and Section ix C Constitutional Issues, determines questions without any discussion or comment concerning the State's allegations that those questions had not been properly preserved for appellate review.[6]

Notwithstanding the legislative requirement of extraordinary scrutiny by this Court in death penalty sentencing

---

**6.** This Court has decided ten death penalty cases since the enactment of Art. 27, §§ 413-415. Tichnell v. State, 297 Md. 432, 468 A.2d 1 (1983); Scott v. State, 297 Md. 235, 465 A.2d 1126 (1983); Foster v. State, 297 Md. 191, 464 A.2d 986 (1983); Harris v. State, 295 Md. 329, 455 A.2d 979 (1983); Poole v. State, 295 Md. 167, 453 A.2d 1218 (1983); Huffington v. State, 295 Md. 1, 452 A.2d 1211 (1982); Johnson v. State, 292 Md. 405, 439 A.2d 542 (1982); Poole v. State, 290 Md. 114, 428 A.2d 434 (1981); Tichnell v. State, 290 Md. 43, 427 A.2d 991 (1981); Tichnell v. State, 287 Md. 695, 415 A.2d 830 (1980). In each of these cases, a multiplicity of questions were presented for review. In *Tichnell I,* the first of these death penalty cases, 14 questions were briefed and argued. Appellee's Brief at i-ii, Tichnell v. State, 287 Md. 695, 415 A.2d 830 (1980). The State alleged that five of those questions had not been properly preserved for appellate review and, therefore, had been waived. This Court found only one of those questions to be without merit on the sole ground that it had been waived. Tichnell, 287 Md. at 713-14, 415 A.2d 840. In the nine cases decided subsequent to *Tichnell I,* this Court has never refused to consider and determine any of the multiplicity of questions briefed and argued before it on the sole ground that it had not been properly preserved for appellate review.

proceedings and this Court's own previous and present express agreement with the virtually universal rule that the principles of waiver ordinarily applied in criminal cases should not be rigidly applied in death penalty cases, the majority here, without explanation or comment, applies a waiver principle. In my view, principles of waiver ordinarily applied with respect to questions not properly preserved for appellate review should not be rigidly applied in a death penalty case. Rather, in such a case, discretion should be exercised to consider and determine questions briefed and argued even if not properly preserved for appeal. Thus, unlike the majority, I would consider and determine the question, raised and argued here — whether testimony concerning the Montgomery County Detention Center incident was inadmissible under § 413 (c) (1) (iii).

In *Scott,* the question presented was whether under § 413 (c) (1) evidence is admissible at a sentencing proceeding to show that an accused convicted of premeditated murder has committed other unrelated crimes for which the accused has not been convicted. The accused there contended that under § 413 (c) (1) (i) and (iii), admissible evidence of unrelated crimes is restricted to evidence of prior convictions. The State contended that evidence of unrelated crimes for which the accused has not been convicted is admissible at a sentencing proceeding under § 413 (c) (1) (v). This Court stated that the language of § 413 (c) (1) (i) through (iv) "collectively unambiguously restricts the type of evidence admissible in a sentencing proceeding in a death penalty case to something less inclusive than what generally is admissible in a sentencing proceeding in a nondeath penalty case." *Scott,* 297 Md. at 246, 465 A.2d at 1132. More particularly, we concluded that § 413 (c) (1) (i) and (iii) preclude "in a death penalty case, the admission of evidence of crimes of violence for which there have been no convictions. . . ." *Scott,* 297 Md. at 247, 465 A.2d at 1133. Additionally, we indicated that those sections not only restrict the type of admissible evidence of unrelated crimes to crimes for which the defendant had been convicted, but also to crimes defined

as crimes of violence under § 413 (g) (1).[7] *Scott,* 297 Md. at 247, 465 A.2d at 1133. Finally, we concluded that the language of § 413 (c) (1) (v) "cannot be construed as authorizing evidence of unrelated crimes to be admitted in a death penalty case, even where there has been no conviction. . . ." *Scott,* 297 Md. at 247, 465 A.2d at 1133.

The record here shows that the State neither proffered nor introduced any evidence to show that the defendant had been convicted of any crime relating to the Montgomery County Detention Center incident. Manifestly, the State has failed · to satisfy its burden of proof. Moreover, the dockets of both the Circuit Court for Montgomery County and the District Court of Maryland sitting in Montgomery County reveal that subsequent to July 1981 the defendant had not been convicted of any crimes other than those relating to the instant case.[8] Consequently, I, unlike the majority, can only conclude that the defendant had not been convicted of any crime related to the Montgomery County Detention Center incident. Under these circumstances, the holding in *Scott* that in a death penalty case § 413 (c) (1) (i) and (iii) preclude the admission of evidence of unrelated crimes for which there have been no convictions is dispositive here. Accordingly, I would hold that the testimony concerning the Montgomery County Detention Center incident was inadmissible under § 413 (c) (1) (iii).[9]

---

7. § 413 (g) (1) provides in pertinent part:

"As used in this paragraph, 'crime of violence' means abduction, arson, escape, kidnapping, manslaughter, except involuntary manslaughter, mayhem, murder, robbery, or rape or sexual offense in the first or second degree, or an attempt to commit any of these offenses, or the use of a handgun in the commission of a felony or another crime of violence."

8. An appellate court may take judicial notice of the records of other courts within this State when required by the "demands of justice." Davidson v. Miller, 276 Md. 54, 67 n.7, 344 A.2d 422, 430 n.7 (1975); Fletcher v. Flournoy, 198 Md. 53, 60-61, 81 A.2d 232, 235 (1951); Campbell v. State, 37 Md.App. 89, 97 n.5, 376 A.2d 866, 870-71 n.5 (1977); James v. State, 31 Md. App. 666, 684-87, 358 A.2d 595, 606-07 (1976).
9. The majority here asserts that "[t]he conduct of Calhoun in this instance, if established in a criminal proceeding against him, would be the common law offense of battery." That offense is not a crime of violence as defined in § 413 (g) (1). Thus, the testimony concerning the Montgomery

Here, the trial court admitted evidence of an unrelated battery for which there was not a conviction. Under § 413 (c) (1) (i) and (iii), this evidence was inadmissible. The admission of this evidence exposed the jury to inflammatory, detailed testimony concerning the underlying facts and circumstances surrounding the unrelated crime. In closing argument, the State's Attorney drew the jury's attention to this inadmissible inflammatory testimony when he said:

> "Can you say that he doesn't present a threat to the personnel who are charged with running our penal institutions if he could do what he did to Sgt. Hunt with that bottle of excrement. And that before being sentenced, before even going to trial, knowing that kind of information could perhaps be presented in any judicial proceeding."

In light of the impact of this testimony and the State's Attorney's reference to it in closing argument, defense counsel felt impelled to respond by addressing the jury as follows:

> "And what should we think of and how shall we apply the evidence that he threw excrement on a guard at the detention center? Shall he go to the gas chamber for that? Why is that offered? It is for you to believe that he is an animal, that he is not human, that you are not really killing a human being."

In my view, the inadmissible evidence was significantly prejudicial to the defendant. Its admission constituted reversible error. Accordingly, I would vacate the death sentence for this reason, as well as for the reasons expressed in Part I in my dissenting opinion in *Tichnell III*.[10]

---

County Detention Center incident would also be inadmissible under the principle articulated in *Scott* that § 413 (c) (1) (i) restricts the type of admissible evidence to crimes of violence as defined in § 413 (g) (1).

**10.** In light of this conclusion, I need not consider the other issues addressed in the majority opinion.